700 F.2d 1115
 PLANNED PARENTHOOD ASSOCIATION OF CHICAGO AREA, an Illinois
not-for-profit corporation, Plaintiff-Appellee,
Cross-Appellant,
v.
William L. KEMPINERS, individually and as Director of the
Illinois Department of Public Health,
Defendant-Appellant, Cross-Appellee,
and
Care Center of Springfield, Inc., Intervening Defendant-Appellant.
 Nos. 81-2919, 81-3006 and 81-3013.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 27, 1982.
Decided Feb. 23, 1983.
 
 Thomas J. Marzen, Americans United for Life Defense Fund, Chicago, Ill., for intervening defendant-appellant.
 Terry Rose Saunders, Jenner & Block, Chicago, Ill., for plaintiff-appellee, cross-appellant.
 Before CUDAHY, ESCHBACH and POSNER, Circuit Judges.
 PER CURIAM.
 
 
 1
 The judgment appealed from is vacated and the case is remanded to the district court for an evidentiary hearing to explore the questions of standing raised in Judge Posner's separate opinion. Circuit Rule 18, which provides that unless otherwise directed a case in which the judgment of the district court is reversed shall be reassigned to a different district judge, shall not apply. After holding the hearing contemplated by this order, Judge Marshall shall enter whatever judgment--e.g., dismissing the complaint in whole or in part if he finds that the plaintiff lacks standing to raise all or some of the issues tendered by its complaint, or reinstating his previous opinion in whole or in part, or modifying it or adding to it, if satisfied that the plaintiff does have standing--is appropriate in light of that hearing.
 
 
 2
 As explained in Judge Cudahy's separate opinion, Judge Cudahy believes that the plaintiff introduced sufficient evidence to establish its standing to raise all of the issues that it has sought to raise on this appeal. But to enable the case to be decided by a majority vote, Judge Cudahy has decided to defer to Judge Posner's view that additional evidence should be taken on the issue of standing, and hence to join in this order. Judge Eschbach believes that the judgment appealed from should be vacated with directions to dismiss the complaint for lack of standing, and has filed a separate opinion explaining his view.
 
 
 3
 VACATED AND REMANDED.
 
 
 4
 CUDAHY, Circuit Judge.
 
 
 5
 In this appeal we are asked to decide whether the State of Illinois may constitutionally deny the plaintiff, Planned Parenthood Association, eligibility for funds under a state program dealing with problem pregnancies, because Planned Parenthood offers its clients abortion counseling and referral services. The district court held that the state law in question is unconstitutional because it actively interferes with the constitutionally protected decision by Planned Parenthood's clients whether to terminate their pregnancies, in violation of the first and fourteenth amendments of the United States Constitution. 531 F.Supp. 320 (N.D.Ill.1981). I would affirm the judgment that the law is unconstitutional, but would do so on the ground that the law constitutes an impermissible penalty on the exercise of first amendment rights by counseling agencies. Since neither of my brethren concurs in this disposition, however, in order to create a majority, I defer to the opinion of Judge Posner, who wishes to remand the case to the district court for further findings about the plaintiff's standing to maintain the suit.
 
 I.
 
 6
 Plaintiff Planned Parenthood Association--Chicago Area ("Planned Parenthood") is a private Illinois non-profit corporation which provides family planning and pregnancy related services, including medical, educational and counseling services to residents of the Chicago metropolitan area. Planned Parenthood operates a Client Services Department which provides, inter alia, pregnancy testing, options counseling service and telephone information service regarding pregnancy, prenatal care and family planning matters. Planned Parenthood does not perform abortions, nor does it encourage or recommend abortions, but it does presently provide its clients with the names of medical abortion facilities which have been evaluated by Planned Parenthood.
 
 
 7
 Planned Parenthood attempts to inform a woman of her options in the event of pregnancy in an objective manner, with the intention that her decision about pregnancy be a fully informed one. As indicated, Planned Parenthood's counseling program involves "options counseling" in which the counselor and client discuss the possibility of continuing the pregnancy as well as the possibility of abortion in light of the client's individual situation. The purpose of the options counseling is to discuss all of the alternatives available to a pregnant woman, including the alternative of abortion, so that the client can have a factual basis on which to decide what course of action is best for her. Therapy is not engaged in nor is a course of action recommended.
 
 
 8
 The Illinois Problem Pregnancy Health Services and Care Act, Ill.Rev.Stat. ch. 111 1/2, Secs. 4601-100--4606-101 (Supp.1980) (the "Act") became effective in 1979. The Act recognizes the need to expand and coordinate services, including counseling, educational and training programs, for women with problem pregnancies. The Act authorizes the Illinois Department of Public Health (the "Department") to make and administer grants to aid and expand community services essential to deal with problem pregnancies.[1] Section 4604-100 of the Act provides, in pertinent part, that "[t]he Department may make grants to nonprofit agencies and organizations which do not refer or counsel for abortion ...." Ill.Rev.Stat. ch. 111 1/2, Sec. 4604-100 (Supp.1980).
 
 
 9
 On March 31, 1981, Planned Parenthood applied for a grant under the Act. Planned Parenthood sought funding for a program, to be operated as part of its Client Services Department, that would provide initial pregnancy testing and medical screening of women seventeen years old and under, options counseling for those women who were pregnant, and follow-up counseling, health and educational services for those women who carried to term, as well as their partners. The application further stated that,
 
 
 10
 All options are discussed in the counseling session. The counselor and client discuss the possibility of continuing the pregnancy, with the woman either keeping the baby or putting the baby up for adoption.... There is also a discussion of the possibility of the client voluntarily terminating her pregnancy. Appropriate referrals are given based on the option chosen by the client.
 
 
 11
 Planned Parenthood's application was denied by the Department on June 10, 1981, for the stated reason that those organizations which had already been funded in the preceding year had priority for future funding.
 
 
 12
 Planned Parenthood then filed this action on June 12, 1981, against the Director of the Department (the "Director") seeking a declaratory judgment that the Illinois Act was unconstitutional, null, void and unenforceable, and requesting injunctive relief against the Director to enjoin him from awarding grants or disbursing funds pursuant to the Act. Count I of the complaint essentially asserted that the statutory disqualification of organizations which provide abortion counseling and referral services constitutes an unconstitutional penalty on Planned Parenthood's exercise of protected rights. Count II of the complaint essentially asserted that the Illinois Act infringes on the rights of Planned Parenthood's clients to decide whether to implement their constitutional right to abort in violation of the fourth, ninth and fourteenth amendments to the United States Constitution. Count III of the complaint asserted that the Act's disqualification of organizations that counsel or refer for abortion creates classifications that deny equal protection of the laws in violation of the fourteenth amendment of the United States Constitution.
 
 
 13
 Planned Parenthood requested the district court to enter a preliminary injunction against the Director. The district court denied the motion on June 30, 1981, and stated that it would instead treat the pending motion as a motion for summary judgment. The Director then filed a cross-motion for summary judgment.
 
 
 14
 Care Center of Springfield, Inc. ("Care Center") filed a motion to intervene as a defendant, which was granted on September 10, 1981. Care Center is a private nonprofit corporation which provides crisis intervention, counseling, education and referrals for persons in situations such as problem pregnancies (but does not refer or counsel for abortion). Care Center received 13% of its funding from the State of Illinois under the Act.
 
 
 15
 On November 23, 1981, the district court entered a final order denying Planned Parenthood's motion for summary judgment as to Counts I and III and granting its motion as to Count II; the order also granted the Director's motion for summary judgment as to Counts I and III and denied his motion as to Count II. On this basis, the district court declared section 4604-100 of the Illinois Act unconstitutional and enjoined the Director from enforcing it.
 
 
 16
 Care Center and the Director appeal from that part of the final order granting Planned Parenthood's motion for summary judgment and denying the Director's motion for summary judgment as to Count II. Planned Parenthood cross-appeals from that part of the final judgment granting the Director's motion for summary judgment and denying Planned Parenthood's motion for summary judgment as to Counts I and III of the complaint.
 
 II.
 
 17
 At the outset, I must address the question of Planned Parenthood's standing to challenge the constitutionality of the Act. Although the parties did not raise the issue, the district court considered it in depth and concluded that Planned Parenthood did have standing to attack the statute as an impermissible basis for the allocation of state funds. 531 F.Supp. at 323-24.
 
 
 18
 The district court observed that Planned Parenthood's injury stemmed from Planned Parenthood's allegation that it had been disqualified for government funds for an impermissible reason. The court determined that if section 4604-100 constituted an impermissible basis for state action, its very existence, without more, constituted constitutional injury to Planned Parenthood. Therefore, the district court found that Planned Parenthood had standing to seek to vindicate its interest in the removal, by a declaration of unconstitutionality, of an allegedly impermissible basis for denying it funds. I would affirm the district court's result as to the standing issue, but think it desirable to explore the matter more fully.
 
 
 19
 The essence of the question of standing is whether "the appellants alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues" before the court. Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The principles of standing have developed out of both constitutionally-based limits on federal court jurisdiction and judicially created prudential restraints upon its exercise. See Warth v. Seldin, 422 U.S. 490, 498-502, 95 S.Ct. 2197, 2204-2207, 45 L.Ed.2d 343 (1975); Wynn v. Scott, 449 F.Supp. 1302, 1308-09 (N.D.Ill.) (three-judge district court), appeal dismissed, 439 U.S. 8, 99 S.Ct. 49, 58 L.Ed.2d 7 (1978), aff'd, 599 F.2d 193 (7th Cir.1979). To satisfy the constitutional minima of standing, appellant Planned Parenthood must show that it has suffered, or is threatened by, a "distinct and palpable injury," Warth v. Seldin, 422 U.S. at 501, 95 S.Ct. at 2206, and that such injury or threat is "fairly traceable" to the conduct or statute being challenged. Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 72, 98 S.Ct. 2620, 2629, 57 L.Ed.2d 595 (1978); Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979); Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977). The prudential limits on standing are somewhat less concrete. At core, they are based upon the principles of avoiding decisions on questions of broad social impact where no individual rights are specifically at stake and of limiting access to the federal courts to those best able to assert a particular claim. Gladstone, Realtors v. Village of Bellwood, 441 U.S. at 99-100, 99 S.Ct. at 1607-1608; Warth v. Seldin, 422 U.S. at 499-501, 95 S.Ct. at 2205-2206.
 
 
 20
 Application of these principles of standing to the facts found by the district court convinces me that there are at least two separate bases upon which Planned Parenthood clearly satisfies both the constitutional and prudential requirements of standing. First, Planned Parenthood is directly injured by the restraint which the continued existence of the allegedly unconstitutional Act places upon its ability to freely compete for whatever funds the State makes available in coming years under the problem pregnancy program. This injury is directly traceable to the Act. The Act, on its face, disqualifies any part of Planned Parenthood from receiving any funds so long as any arm of the organization "refers or counsels" clients as to an abortion option. Sec. 4604-100. Thus, even if Planned Parenthood desires to offer separate problem pregnancy services which do not include counseling as to abortion options, the Act directly disqualifies Planned Parenthood from receiving any funds.
 
 
 21
 The record indicates that Planned Parenthood's problem pregnancy services include many things besides "abortion counseling." For example, each young woman who participates in Planned Parenthood's program receives at least seven hours of sexuality education designed, in part, to demonstrate the importance of pre- and post-natal care. See Description of Program Objectives in Planned Parenthood's Application for Funds, attached to Complaint, R.1. Moreover, for those participants who choose to carry their pregnancies to term, Planned Parenthood provides parental counseling, nutritional guidance, educational and vocational advice, and medical referrals. Id. These non-abortion related services fit squarely within the objectives of the Illinois Problem Pregnancy Health Services and Care Act. See Ill.Rev.Stat. ch. 111 1/2, Sec. 4604-101(A) and (B) (Supp.1980). In addition, they are strikingly similar to the problem pregnancy services provided by the intervenor Child Care Center, as described at page 5 of the Center's appellate brief. Thus, the record strongly indicates that Planned Parenthood has a substantial interest in applying for funds not to be used in any part for abortion counseling.
 
 
 22
 It is not necessary, for Planned Parenthood to have standing to attack the statute, to show that in its absence it would actually receive funding; it is sufficient that the statute as it stands prevents Planned Parenthood from competing freely for the funds.[2] Regents of the University of California v. Bakke, 438 U.S. 265, 280-81 n. 14, 98 S.Ct. 2733, 2742-43 n. 14, 57 L.Ed.2d 750 (1978); Larson v. Valente, 456 U.S. 228, 102 S.Ct. 1673, 1682 n. 15, 72 L.Ed.2d 33 (1982). See also Baker v. Carr, 369 U.S. at 208, 82 S.Ct. at 705. I cannot predict what will happen if the state enacts a constitutionally acceptable version of the Act, and if Planned Parenthood submits an application for funds which satisfies the requirements of the Act. It is not necessary, however, for the purposes of standing in this case, to foresee a successful application and a subsequent grant of funds to Planned Parenthood. It is more than sufficient that the elimination of the offending provisions of the Act will simply enable Planned Parenthood to compete freely with other organizations in the field for whatever funds the state chooses to make available in a given year.[3]
 
 
 23
 Planned Parenthood also has standing to challenge the constitutionality of the Act based upon the injury it suffered when its 1981 application for funds was denied. Appellants argue that this application was denied for a wholly legitimate reason: no funds were available due to the priority given to applicants which had received funding in prior years. Appellant's argument misconceives the standing question at issue here. It is not necessary, to create standing, for the invalidation of an offending statute to totally redress a litigant's complaint. As the Supreme Court has stated, " 'the relevant inquiry is whether ... the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision.' " Larson v. Valente, 102 S.Ct. at 1682 n. 15 (emphasis in original), quoting from Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). Planned Parenthood thus need not show "that a favorable decision will relieve [its] ... every injury," 102 S.Ct. at 1682 n. 15 (emphasis in original), only that a successful resolution of its claim will remove at least one substantial impediment to its ultimately receiving funds.[4] See also Regents of the University of California v. Bakke, 438 U.S. at 280-81 n. 14, 98 S.Ct. at 2742-43 n. 14.
 
 
 24
 A holding that section 4604-100 is unconstitutional would meet this test. Section 4604-100, on its face, completely precluded Planned Parenthood from being considered on an equal basis with other counseling organizations. While the invalidation of section 4604-100 may not necessarily lead to a grant of funds on the basis of Planned Parenthood's 1981 application, it will give Planned Parenthood the ability to have its application considered on its merits.
 
 
 25
 There are certainly no prudential limits on standing which would be offended by a finding that Planned Parenthood has standing to challenge the Act. Planned Parenthood is not in court asserting the rights of others or merely seeking an advisory opinion as to a matter of general social interest. Planned Parenthood is here protecting its own rights, seeking an adjudication which will directly control its own ability to receive funds from the state.[5] Planned Parenthood is clearly the party "best able" to litigate the denial of its own application for funds.
 
 
 26
 Appellant argues that even if the case satisfies the requirements of standing due to the restriction on Planned Parenthood's ability to compete for funds in the future, the case is not yet ripe for review, because it is unclear what action the State will take on such future requests for funding.[6] I think that such an argument is somewhat disingenuous. The statute, as it stands, currently prohibits Planned Parenthood from competing freely for whatever funds the State will make available. I do not believe that there is anything in the record to support the contentions which appellants make in their reply briefs that there is a question whether an organization which counsels or refers for abortion would be precluded from funding. Appellant Kempiner's Reply Brief at 16-20, Appellant Care Center's Reply Brief at 17-18. The statutory language is certainly unambiguous. The provision in question cannot reasonably be interpreted to mean anything but that Planned Parenthood cannot now, and will not in the future, receive funding regardless of how it structures its application. Delay in the consideration of this matter, therefore, would not "significantly advance [this court's] ... ability to deal with the legal issues presented nor aid [it] in their resolution." Duke Power Co. v. California Environmental Study Group, Inc., 438 U.S. 59, 82, 98 S.Ct. 2620, 2635, 57 L.Ed.2d 595 (1978).
 
 
 27
 Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), cited by appellant Care Center, is not in point. In Poe, the criminal statute in question had not been enforced and plaintiff had not been injured because he had not been prosecuted nor was there any threat of prosecution. Here, however, there has already been a denial of equal access to funding which, on the face of the statute, will continue no matter how the application for funding may specifically be framed.
 
 
 28
 Given that this statute acts as a significant potential restraint upon Planned Parenthood's first amendment rights, I am particularly reluctant to needlessly delay consideration of the merits of this case. As the Supreme Court has noted in a similar context, " '[t]he threat of sanctions may deter [the exercise of first amendment rights] almost as potently as the actual application of sanctions.' " Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 1120, 14 L.Ed.2d 22 (1965), quoting from N.A.A.C.P. v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963). Requirements of ripeness are less strictly construed in the first amendment context due to the chilling effect on protected expression which delay might produce. See Martin Tractor Co. v. Federal Election Commission, 627 F.2d 375, 380 (D.C.Cir.), cert. denied, 449 U.S. 954, 101 S.Ct. 360, 66 L.Ed.2d 218 (1980); National Student Association v. Hershey, 412 F.2d 1103, 1110-15 (D.C.Cir.1969); Spartacus Youth League v. Board of Trustees of Illinois Industrial University, 502 F.Supp. 789, 796-97 (N.D.Ill.1980); 13 C. WRIGHT, A. MILLER and E. COOPER, FEDERAL PRACTICE AND PROCEDURE Sec. 3532 at 245 (1975). I think that, considering the relatively broad range of services which appear to qualify for grants under the Act, there could well be a general chilling effect on pregnancy counseling services if counseling for abortion were to result in ineligibility for assistance to a wide variety of other services.[7] The Act forces Planned Parenthood itself to choose between exercising its first amendment right to speak and act on whatever issues it wishes and preserving eligibility for state funds under the Act. This constraint seriously injures Planned Parenthood, and further delay in consideration of the constitutionality of the Act will only serve to accentuate Planned Parenthood's current injury.
 
 
 29
 Judge Eschbach has, I think, with all respect, lost sight of the forest in his close scrutiny of the trees and has concluded that Planned Parenthood calls on us only for an advisory opinion. Judge Posner seems uncomfortable without explicit answers in the record to certain questions. Considering to whom the questions are addressed, the answers seem to me, again with all respect, predictable to a virtual certainty.[8] Although the facts before us are not abundant as to some matters, they are more than sufficient with regard to standing.
 
 
 30
 I certainly agree that we are not in the business of rendering constitutional advice to casual bystanders. But we are dealing here with a plaintiff prominently identified with abortion counseling and therefore patently ineligible for funds under the Act. In addition, Planned Parenthood is interested and engaged in other pregnancy programs, which apparently closely parallel those offered by the intervening defendant (Care Center), which has received substantial funds under the Act. As will appear, I think the state may constitutionally refuse to fund an abortion counseling program but may not disqualify from all funding an organization which incidentally engages in abortion counseling. This, I think, imposes an unconstitutional penalty on the exercise of constitutional rights.
 
 
 31
 This case presents a hard question but a real one between adversaries currently, and in the future, locked in controversy over entitlement to limited state funds. It is the duty of a federal court to answer hard questions involving the important constitutional rights of litigants suffering real injury. Here I think we magnify the due caution surrounding the standing to sue into an undue reluctance to answer hard, and properly raised, constitutional questions.
 
 III.
 
 32
 In Count I of its complaint, Planned Parenthood asserts that the statutory disqualification of grant applicants that provide abortion counseling and referral services represents an unconstitutional penalty on the exercise of protected rights. The district court granted the defendant's motion for summary judgment in this claim, holding that the state's denial of funds to Planned Parenthood, in the context of its specific funding requests, did not constitute a penalty on protected activities. For the following reasons I conclude that section 4604-100 on its face imposes a penalty on the exercise of constitutional rights, and accordingly is invalid.
 
 
 33
 In both Harris v. McRae, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) and Maher v. Roe, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), the Supreme Court, in the course of upholding legislative decisions not to fund the performance of abortions, strongly suggested that a concurrent deprivation of government funds not intended for the performance of abortions might very well result in an unconstitutional penalty:
 
 
 34
 [A] substantial constitutional question would arise if Congress had attempted to withhold all Medicaid benefits from an otherwise eligible candidate simply because that candidate had exercised her constitutionally protected freedom to terminate her pregnancy by abortion. This would be analogous to Sherbert v. Verner, 374 U.S. 398 [83 S.Ct. 1790, 10 L.Ed.2d 965], where this Court held that a state may not, consistent with the first and fourteenth amendments, withhold all unemployment compensation benefits from a claimant who would otherwise be eligible for such payments but for the fact that she is unwilling to work one day per week on her Sabbath.
 
 
 35
 Harris, 448 U.S. at 317 n. 19, 100 S.Ct. at 2688 n. 19. And before that the Court had said:
 
 
 36
 Appellees rely on Shapiro v. Thompson, 394 U.S. 618 [89 S.Ct. 1322, 22 L.Ed.2d 600] (1969), and Memorial Hospital v. Maricopa County, 415 U.S. 250 [94 S.Ct. 1076, 39 L.Ed.2d 306] (1974). In those cases durational residence requirements for the receipt of public benefits were found to be unconstitutional because they "penalized" the exercise of the constitutional right to travel interstate.
 
 
 37
 ....
 
 
 38
 If Connecticut denied general welfare benefits to all women who had obtained abortions and who were otherwise entitled to the benefits, we would have a close analogy to the facts in Shapiro, and strict scrutiny might be appropriate under either the penalty analysis or the analysis we have applied in our previous abortion decisions.
 
 
 39
 Maher, 432 U.S. at 474-75 n. 8, 97 S.Ct. at 2382-83 n. 8.
 
 
 40
 It is well established that the state may not condition the receipt of a governmental benefit on the waiver of first amendment rights. In Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), the Supreme Court invalidated a statute which granted a tax exemption to veterans only if they subscribed to an oath that they did not advocate the overthrow of the government by force. There the Court said:
 
 
 41
 It cannot be gainsaid that a discriminatory denial of a tax exemption for engaging in speech is a limitation on free speech.... To deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech, its deterrent effect is the same as if the state were to fine them for this speech.
 
 
 42
 Id. at 518, 78 S.Ct. at 1338.
 
 
 43
 The Supreme Court reaffirmed this principle in holding the state's denial of unemployment benefits to a plaintiff because he left his job for religious reasons to be an unconstitutional burden on the free exercise of religion. Thomas v. Review Board of Indiana Employment Security Division, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). Accord Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). See also Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (government employee could not be denied employment because he had exercised his free speech rights); Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (dismissal from nonpolicymaking position solely on basis of political affiliation is unconstitutional, although there is no right to public employment); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (denial of welfare benefits unconstitutionally infringes right to travel although plaintiff had no right to such benefits). Any argument in the case before us that Planned Parenthood may not avail itself of the penalty argument because neither it nor any other organization had any right to grants under the Act is clearly refuted by the case law. See, e.g., Perry v. Sindermann, where there was no right to employment, Elrod v. Burns, where there was no right to public employment and Shapiro v. Thompson, where there was no right to welfare benefits.
 
 
 44
 Judged under the standards set forth in these decisions, the Illinois Act clearly imposes an impermissible penalty on the exercise of protected free speech rights by counseling agencies. Section 4604-100 of the Act provides for funds to be used for a variety of purposes related to pregnancy counseling, but limits grant eligibility to "nonprofit agencies and organizations which do not refer or counsel for abortion...." Under the literal terms of the statute, therefore, an organization which requests funds under the Act for, for example, a program of nutritional services and nutritional information and counseling, see Ill.Rev.Stat. ch. 111 1/2, Sec. 4604-103(e) (Supp.1980), would be ineligible to receive funds for these purposes if it also maintained a program which engaged in abortion counseling. Thus, such an agency is denied benefits for which it would otherwise be eligible, solely because its privately funded activities include abortion-related counseling. This kind of wholesale deprivation penalizes the agency for exercising its first amendment right to counsel for abortion.
 
 
 45
 The district court in the instant case recognized that the Act imposed such a penalty, but declined to invalidate the statute on this ground. I think the district court erred in refusing to declare the Act unconstitutional as a penalty on the exercise of protected rights. On its face, the Act imposes a penalty by disqualifying organizations from all benefits under the Act to which they would otherwise be entitled, simply because of their privately funded first amendment speech. The district court may perhaps have been correct that it would not constitute an unconstitutional penalty for the State of Illinois to deny funds to a program that conducted abortion counseling (in contrast to denying funds to the parent organization of such a program), but the law under which such a denial could be made is not now before us. The statute challenged in this case sweeps considerably more broadly and on its face constitutes a penalty. It is no answer to Planned Parenthood's challenge that the State of Illinois could, under a different statute than the one now on the books, deny its application for a grant. It is well-settled that the "constitutional validity of the law is to be tested not by what has been done under it, but what may, by its authority, be done." Montana Co. v. St. Louis Mining and Milling Co., 152 U.S. 160, 170, 14 S.Ct. 506, 509, 38 L.Ed. 398 (1894).
 
 
 46
 Consequently, I would hold that the Illinois Act, by disqualifying from grants all agencies that counsel or refer for abortion, imposes, on its face, an unconstitutional penalty on the exercise of constitutional rights by disqualified agencies. The Act cannot be construed otherwise, so I would decline Care Center's invitation to remand the case to determine whether the Act creates such a penalty. The State of Illinois could, if it desired, enact a valid law that restricts funding under the program to activities that do not involve abortion-related counseling. I think that it is better to strike down the present law as invalid, and allow the state to decide whether it wants such a valid law, rather than to risk defeating the intention of the Illinois legislature by distorting the present statute through a limiting construction.[9]
 
 IV.
 
 47
 Count II of Planned Parenthood's complaint alleges in essence that the Act's funding scheme impinges on the rights of Planned Parenthood's clients, through an active effort to interfere with their decisions whether to have an abortion. By funding only programs which provide no abortion counseling and referral, the state is alleged to provide women with
 
 
 48
 incomplete and misleading information concerning their options. Therefore, the Act directly interferes with the rights of women, who will reasonably rely on this distorted information, to make an informed decision as to whether to carry a pregnancy to term.
 
 
 49
 Complaint p 22. the district court construed this count of the complaint as alleging a direct attempt by the state to obstruct the path of women seeking to exercise their constitutional rights. The district court held that this effort violated both the fourteenth amendment right to have an abortion, as announced in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and also the first amendment rights of women as "listeners" to receive information.
 
 
 50
 With respect to the due process ground, the district court first asserted that the privacy right recognized in Roe v. Wade was "not so much the actual abortion as the process of deciding whether or not to abort." 531 F.Supp. at 327. The Act's funding scheme has the effect of manipulating this protected decisional process, the district court reasoned, because it insures that a woman will not be told of the complete range of options and the relevant considerations in her decision. 531 F.Supp. at 329. By preventing women from receiving complete information necessary to intelligent and informed exercise of the protected decision whether to abort, the Act was held by the district court to interfere with the fundamental right of pregnant women to make the "protected decision whether to bear or beget a child." 531 F.Supp. at 327.
 
 
 51
 The district court's first amendment analysis also derived from the allegedly misleading character of the counseling information disseminated under the Act's scheme of funding. The district court suggested that the state had created an avenue for the communication of constitutionally protected information but that it had impermissibly created categories of protected and unprotected information by permitting grantees to provide information about childbirth but not about abortion. The court noted that the distinction that the state had drawn in the Act was content-based, i.e., based on the difference between information about carrying the fetus to term and information about having an abortion. Concluding that this content-based distinction required the strictest scrutiny, the district court observed that
 
 
 52
 Illinois is not simply refusing to subsidize abortion-related services. It instead goes further and discriminatorily treats free speech concerning abortion. By so doing, it seeks to prevent pregnant women from receiving information about abortion.
 
 
 53
 531 F.Supp. at 331. The Act's preferential treatment of speech concerning childbirth was itself illegitimate, the district court stated, since it constituted censorship forbidden by the first amendment.
 
 
 54
 I have considered each of these theories which the district court upheld under Count II. For the reasons which follow, I find the due process argument unconvincing. Although my views on the matter of free speech are more tentative, I am inclined at this time also to reject that argument.
 
 A.
 
 55
 As indicated, I do not believe that the Act constitutes an unconstitutional infringement upon the due process right of women to make a free and informed choice between abortion and bearing to term. Although the due process question is a difficult one, as was reflected in the district court opinion, I think that the case law indicates that the state's actions do not constitute a due process violation. I begin with the Supreme Court's clear statement that the constitutional right to have an abortion is not infringed by a state or federal program which pays medical expenses of childbirth but which refuses to pay the expenses of an abortion. Harris v. McRae, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980); Maher v. Roe, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977). In Maher, the district court held that the Connecticut welfare regulation under which Medicaid recipients received payments for medical services incident to childbirth, but not for medical services incident to non-therapeutic abortions, violated the equal protection clause of the fourteenth amendment. The Supreme Court reversed this holding that the unequal funding of childbirth and abortion impinged on the fundamental right to abortion, explaining that Roe v. Wade and its progeny do not prevent a state from making a "value judgment favoring childbirth over abortion and ... implement[ing] that judgment by the allocation of public funds." Maher v. Roe, 432 U.S. at 474, 97 S.Ct. at 2382. Harris v. McRae validated the constitutionality of the Hyde Amendment, a federal statute which withheld federal funding for abortions deemed to be "medically necessary" for maternal health. The Harris Court held that the Hyde Amendment "places no governmental obstacle in the path of a woman who chooses to terminate her pregnancy." 448 U.S. at 315, 100 S.Ct. at 2687.
 
 
 56
 But, regardless of whether the freedom of a woman to choose to terminate her pregnancy for health reasons lies at the core or the periphery of the due process liberty recognized in Wade, it simply does not follow that a woman's freedom of choice carries with it a constitutional entitlement to the financial resources to avail herself of the full range of protected choices.
 
 
 57
 Harris v. McRae, 448 U.S. at 316, 100 S.Ct. at 2687.
 
 
 58
 Since a woman's freedom of choice does not carry with it a constitutional entitlement to the "financial resources" to have an abortion, it seems equally clear to me that there is no entitlement to funds for pregnancy counseling which includes the abortion option. Certainly it is more obstructive of a woman's right to undergo an abortion to deny her funding for the operation than to deny funding to a counseling service with which she might consult. The effort of the district court in this case to fashion a constitutional right to governmentally provided abortion information standing apart from the right to the abortion itself, is ingenious but cannot withstand rigorous analysis. Thus, although, under the Act, Illinois has chosen to subsidize a certain type of pregnancy counseling, but not abortion counseling or referrals, the Act leaves the woman with the same range of choices she would have had if the State of Illinois had chosen to fund no pregnancy counseling services at all. I think that the denial of funds appropriated under the Act to programs that counsel or refer for abortion cannot be said to "impinge[ ] on the constitutionally protected freedom of choice recognized in Wade." 448 U.S. at 317, 100 S.Ct. at 2688 (footnote omitted).
 
 
 59
 The district court believed that the state in this case "directly intrudes on the counseling relationship, and statutorily prohibits full and complete pregnancy options counseling." 531 F.Supp. at 329. The essence of this argument is that the Act results in women receiving distorted information and therefore precludes them from exercising a voluntary and informed choice. But there has been no showing that either the purpose or effect of the program provided under the Act is to "distort" information.[10] Rather, it appears that the purpose and effect of funding under the Act is simply to implement Illinois' valid preference for childbirth over abortion through an information program. The information provided does not seem to me necessarily deceptive or distorted; it is merely, from Planned Parenthood's perspective, incomplete.
 
 
 60
 In any event, the counseling program of the Act is not directly coercive. Thus, the Act is quite different from an "informed consent" provision that imposes criminal penalties unless certain information is made available to the woman contemplating abortion. That was the context in which the Supreme Court announced the state may not "straitjacket" the physician in the practice of his or her profession. See Planned Parenthood v. Danforth, 428 U.S. 52, 67 n. 8, 96 S.Ct. 2831, 2840 n. 8, 49 L.Ed.2d 788 (1976). The district court's discussion of active interference with, or control of, persons who provide abortion counseling or referrals is somewhat tangential in the context of the Act, which concerns only the state's failure to subsidize certain types of information.
 
 
 61
 The Act does not directly intrude upon the counseling relationship. Planned Parenthood was free to counsel with respect to pregnancy options before the Act was passed, and has remained entirely free to provide options counseling during the time that the Act has been in effect. Similarly, women remain free to engage Planned Parenthood's services now as they were free to do before the Act became law.
 
 
 62
 Finally, the Act does not insure that women will not be told of the complete range of options in the event of pregnancy. The state has merely chosen to fund a particular kind of counseling and care service to further its legitimate state interest in childbirth and family welfare.[11] Women are free to seek the services of funded or nonfunded programs or to seek and obtain information and counseling from any source whatever, including their relatives, friends, co-workers or physicians. They are in no way restricted or compelled to receive or not receive information.
 
 
 63
 If denial of funds for abortion--non-therapeutic and medically necessary--is not government interference, then, I think, the denial of funds for abortion-related counseling is not government interference. Failure to fund abortion counseling or referrals, therefore, does not interfere with or burden the fundamental right to choose to undergo an abortion, any more than does the refusal of the state to fund abortion performance.
 
 B.
 
 64
 I believe that the free speech issue here is particularly close and seems to turn, for the present at least, largely upon the relatively benign configuration of the few facts which have been presented to us. The district court found in favor of Planned Parenthood with respect to this contention primarily on the theory (which seems to me speculative) that the Act operated to deprive women of their first amendment right to obtain information and counseling of all kinds that might be relevant to their pregnancy. Plaintiff's position is that the Act contains a "content-based" distinction between two "points of view" and is, therefore, subject to strict judicial scrutiny, regardless of the fact that it represents a governmental social and economic funding program rather than, for example, a law with criminal sanctions.
 
 
 65
 Both plaintiff and the district court seem to say that it is one thing for the state to distinguish between abortion and childbirth in its funding programs, but it is quite another for the state to distinguish in its funding programs between speech concerning childbirth and abortion. In response, intervenor Care Center relies heavily on Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), and Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). In the Meyer case, the Supreme Court ruled that, while a state may not by imposition of criminal sanctions prohibit the teaching of German in its grade schools, it need not fund it either. Thus, the state was free to encourage instruction in the English language by providing funds for that purpose while denying them for instruction in other courses.[12] This very distinction in Meyer was relied upon in Maher v. Roe, 432 U.S. at 476-77, 97 S.Ct. at 2383-84. What we have before us now, however, on the facts of this case does not involve a prohibition, but simply the right of the state to subsidize speech involving one set of responses to the problem of pregnancy at the expense of another--abortion. An important aspect of the response-to-pregnancy problem involves, of course, the right to have an abortion, protected by the Constitution. I think Meyer, and its distinction between subsidization and prohibition, may be apposite to the facts before us, as I construe them. But I specifically note that the facts do not appear to involve state-subsidized propaganda aimed significantly at condemning the alleged evils of abortion. I make no judgment on a case involving such communications.
 
 
 66
 Planned Parenthood suggests that a more relevant analogy to the freedom of speech problem now before us is the situation that would arise if a state should fund school courses in political history but should preclude funded schools from teaching about the history of the Republican Party. I believe, however, that this analogy is inapt because on the facts before us the state has a legitimate and substantial interest in promoting and fostering childbirth and not abortion, while no legitimate state interest in precluding study of the Republican Party has been suggested.
 
 
 67
 I recognize that the Act contains a provision forbidding grantees from engaging in abortion counseling and referral and, in that sense, might be argued to be "prohibitory"; in some fact situations such a provision might well be unconstitutionally prohibitory. But, in my judgment, on the meager facts before us, the provision in question merely serves to define the scope and nature of the counseling to be subsidized and does not appear to be a "restriction" on speech unless, as I have shown, a violation of it were to be penalized by denial of funds in other areas. I believe, lacking any factual showing to the contrary, that the prohibitory aspect may be perceived as a legitimate means of defining the sort of counseling which is to be the subject of the grants. As a rough analogy, state funds may be earmarked for the encouragement of family planning without requiring the subsidization of propaganda on unconstrained reproduction. In that context, the funding of information on unlimited reproduction might be prohibited. The Constitution presumably does not engraft an "equal time" requirement onto the dispensation of state funds for the encouragement of matters reflecting a legitimate state interest. On the other hand, the prohibitory aspect of this statute could very easily involve a constitutional violation under facts going somewhat beyond the extremely sketchy ones which are before us.[13]
 
 
 68
 I think that the state in its funding policies may encourage courses of action in which it has a legitimate and substantial interest provided that it places no obstacles, other than failure to fund, in the way of expressions of other points of view which may be contrary, to one degree or another, to that of the state and provided that it refuses to subsidize speech which intimidates or restricts persons in the exercise of their constitutional rights. I am tentatively of the view that the district court erred in holding that "a discriminatory refusal to subsidize protected speech constitutes censorship forbidden by the first amendment." 531 F.Supp. at 331. Nor do I believe that the district court's analysis to the effect that "[t]he fact that the Illinois statute constitutes discrimination against a disfavored viewpoint means that the interest it serves is constitutionally impermissible" is appropriate. Id. I think that the district court was incorrect in concluding, in effect, that the first amendment imposes an obligation to provide equal time with respect to programs funded by the state. The state here does not purport to be subsidizing a full line of "options" counseling. The state has selected those options, the counseling of which it deems worthy of funding (it having a legitimate interest in these options); I conclude, tentatively at least, that the state is under no constitutional duty to fund counseling in other options.[14] See Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); Maher v. Roe, Harris v. McRae. The state may not, however, through speech or otherwise, interfere in any way with the constitutional right to pursue these other options.
 
 
 69
 Relying on Perry Local Educators' Association v. Hohlt, 652 F.2d 1286 (7th Cir.1981), cert. granted, 454 U.S. 1140, 102 S.Ct. 997, 71 L.Ed.2d 291 (1982), Planned Parenthood argues that through the Act Illinois has created a channel of communication and that the first amendment requires that such a channel be made available to diverse points of view and not simply to one that a state favors. But here I think that the state's legitimate interest was in the message to be conveyed, not necessarily in the channel of communication through which the message was to be sent. It seems to stretch the point to analogize a program for the counseling of pregnant women to a mail service or a radio station set up by government for the conveyance of messages of all sorts. Cf. Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); Shuttleworth v. Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966).
 
 
 70
 I think it is also unhelpful to speak of the message as necessarily being "distorted" and of the pregnant women recipients as being left in ignorance or improperly informed. It is presumably not the duty of the state to provide funds for conveying information of any kind to pregnant women. If the state can demonstrate that its legitimate interest is served, it is probably not a constitutional violation for the state to subsidize information presumably leading to childbirth while failing to provide funds for information leading to abortion (or presumably vice versa).
 
 
 71
 My conclusions about freedom of speech and freedom to receive information in the context of the Act are, as indicated, tentative and rely primarily on the teaching of the Supreme Court that a state may have a legitimate and substantial interest in fostering childbirth over abortion through its funding policies. See Maher v. Roe, 432 U.S. 464, 474, 477, 97 S.Ct. 2376, 2382, 2384, 53 L.Ed.2d 484; Harris v. McRae, 448 U.S. at 314, 100 S.Ct. at 2686. Obviously, lacking a legitimate state interest, a state funding preference would appear in an entirely different light.
 
 
 72
 Therefore, I would not at this time adopt the argument, which the district court found persuasive, that the first amendment is violated, under the particular circumstances of this case, by a state subsidy of counseling with reference to some pregnancy options without counseling as to all such options. I think, as I have indicated, that the analysis of this point, although more demanding because of the involvement of crucial and very sensitive first amendment values, appears to be essentially congruent with my earlier analysis of the alleged violation of a woman's constitutionally protected right to a free and informed choice with respect to abortion. But the right to speak and the right to obtain information, which are involved in the process, require a particularly searching analysis. Nonetheless, in the end that analysis seems to parallel the analysis of the alleged impairment of the protected freedom of choice. And both of these arguments--one turning on the constitutional right of freedom of choice and the other turning on the constitutional right to freedom of speech--seem to be controlled by Maher v. Roe and Harris v. McRae, which distinguish between governmental obligations to fund and governmental obligations to refrain from impairing or penalizing in any way (through speech or otherwise) the abortion process--both decisionmaking and consummation. It goes without saying that all I have said about the Act and its funding provisions does not reflect in any way adversely upon the basic rights established by Roe v. Wade and its progeny. I would also emphasize that my views--particularly with regard to the free speech question--are necessarily tentative (given the reluctance of my brethren to consider the merits).
 
 V.
 
 73
 In Count III of the Complaint, Planned Parenthood asserts that the Act's disqualification of organizations that counsel or refer for abortion creates a classification that denies equal protection of the laws. I agree with the district court's conclusion that this claim is without merit.
 
 
 74
 I first note that the State of Illinois has a legitimate and substantial interest in protecting potential life. Harris v. McRae, Maher v. Roe, Roe v. Wade. Thus, Illinois is constitutionally free to express its preference for childbirth over abortion and to allocate its funds so as to encourage the former over the latter. So long as this preference is expressed as a mere refusal to subsidize and does not involve a direct interference with the abortion decision the classification incorporated in the Act is rationally related to a legitimate and substantial state interest. Hence, I believe that for this funding purpose, section 4604-100 may create a classification between programs which counsel and refer for abortions and programs which do not without violating the equal protection clause.
 
 
 75
 However, since, as I have indicated, the Act imposes an unconstitutional penalty on the right to provide abortion counseling and to refer for abortion, I would affirm the judgment of the district court.
 
 
 76
 ESCHBACH, Circuit Judge.
 
 
 77
 In the case before me, I find a plaintiff which was denied a grant of state funds in 1981 because all of the funds were committed to continuing the existing programs of previous grantees. Plaintiff does not, however, complain that it was entitled to the funds; it does not suggest that the state's decision to exclude it from the program in favor of the previous grantees violates any of its rights. In short, it seems that the case before me is no case at all.
 
 
 78
 Plaintiff, however, after examining the language of the statute which governs this program, believes it has discovered that some of it is inconsistent with several principles of constitutional law, and has decided to give a federal court the benefit of its views on this matter. Reflecting on the question, the district court reached the conclusion that the language is inconsistent with some constitutional principles, but inoffensive to others.
 
 
 79
 Before doing so, however, the district court correctly recognized that the lawsuit before it presented a jurisdictional issue which defendants had failed to raise, and the district court considered plaintiff's interest in the outcome of the lawsuit. Examining the challenged statutory language and plaintiff's organizational purpose, the court held that the statute's "very existence, without more, constitutes constitutional injury to Planned Parenthood." 531 F.Supp. 320, 324 (N.D.Ill.1981).
 
 
 80
 Although the district court, erroneously in my view, concluded that Planned Parenthood was injured by the statute it seeks to invalidate, the district court insightfully recognized that the plaintiff did not have standing to raise the theory contained in Count I of its complaint. The district court, in a view shared by my brother Cudahy, was persuaded that a denial of funding to Planned Parenthood on the ground that it provided abortion counseling with private funds would operate as an unconstitutional penalty. The district court correctly realized, however, that such a case was not before it and thus declined to declare the Act unconstitutional on that ground. The district court's refusal to do so is a testament to the case or controversy requirement, demonstrating how inherent it is in the power of judicial review.
 
 
 81
 The standing defect I perceive in this case is more basic than the one implicitly recognized by the district court. It too decided a constitutional question not properly before it--whether a denial of the application Planned Parenthood actually submitted on the abortion counseling ground would be violative of Planned Parenthood's constitutional rights. We need not address that question--we may not address that question--because the application was not denied for that reason.[1]
 
 
 82
 "[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.' " Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted). This requirement of a distinct and palpable injury is present whenever a suitor enters a federal courthouse, irrespective of the substantive nature of his claim, and "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." Id.
 
 
 83
 While the Article III standing requirement obtains in all lawsuits, it is especially crucial when a litigant seeks to invoke the court's power of judicial review. Indeed, a federal court
 
 
 84
 "has no jurisdiction to pronounce any statute, either of a state or of the United States, void, because irreconcilable with the constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies. In the exercise of that jurisdiction, it is bound by two rules, to which it [must] rigidly adhere [ ]: one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other, never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." Kindred to these rules is the rule that one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other ... situations in which its application might be unconstitutional.
 
 
 85
 United States v. Raines, 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524 (1960) (citation omitted). It is therefore a fundamental principle of constitutional adjudication that a court "will not pass upon the validity of a statute upon complaint of one who fails to show that he is injured by its operation," Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring), and "[i]n order to invoke a court's power of judicial review, it is incumbent upon a litigant to demonstrate an injury [resulting from the operation of the statute] which is real, not imaginary; concrete, not abstract; apparent, not illusory; and demonstrable, not speculative." Myron v. Chicoine, 678 F.2d 727, 730 (7th Cir.1982).
 
 
 86
 Under the foregoing principles, Planned Parenthood lacks standing to challenge the abortion counseling provision which it seeks to have declared unconstitutional. There is nothing in the record before us which indicates that Planned Parenthood has been injured by the provision and it is speculative and conjectural, at best, that Planned Parenthood will ever be injured by the provision. It is undisputed that plaintiff's 1981 application was denied for a reason having nothing to do with abortion, and there is nothing in the record to indicate that any future applications would be treated differently.
 
 
 87
 That should be the end of this case, for Planned Parenthood does not challenge the ground upon which its application was denied. It is not the end of the case, for Planned Parenthood apparently has more interest in the constitutionality of Sec. 4604-100 than it does in obtaining the state funds it was denied.
 
 
 88
 Recognizing Planned Parenthood's standing to litigate the constitutionality of the challenged provision elevates the most abstract and speculative of interests into the concrete and palpable injury required by Article III,[2] and fashions a constitutional right for plaintiff: the right to have the "ability" to compete "freely" for funds in the future. Any state statute which may interfere with that "ability" may be challenged on the ground that it is violative of the United States Constitution. Plaintiff need not engage in mere "paper-shuffling" and actually apply for the funds in order to attack the validity of the restriction on funding; it need not be turned down by the state; it merely need enter a federal courthouse and inform the court of the existence of the restriction which might one day be applied to it. The federal court will then decide the issue for it, and plaintiff will be left serene, knowing whether or not its "ability" to compete is secure.[3]
 
 
 89
 The freedom to compete argument reasons that this is a case or controversy because a case or controversy might arise. Planned Parenthood might submit an application which might be denied because of the provision it finds so repugnant. In my opinion, this stands the case or controversy requirement on its head, and treats the Article III standing requirement as a mere formality, "a troublesome hurdle to be overcome if possible so as to reach the 'merits' of a lawsuit which a party desires to have adjudicated ...." Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., supra, 454 U.S. at 476, 102 S.Ct. at 762.
 
 
 90
 The defect in the freedom to compete standing analysis is, however, even more fundamental. It does not analyze plaintiff's standing; instead, the standing analysis is merely a decision on the merits of plaintiff's constitutional argument. Planned Parenthood argues that it has a constitutional right to compete freely for pregnancy counseling funds even though it provides abortion counseling services. My brother Cudahy concludes Planned Parenthood has standing to raise that claim because "the elimination of the offending provisions of the Act will ... enable Planned Parenthood to compete freely with other organizations ...." Ante at 1120. Plaintiff thus has standing because granting it the relief it seeks will recognize the right it claims to have. Of course declaring the statute unconstitutional will mean that Planned Parenthood has a right to compete freely for these funds even though it provides abortion counseling. That does not give Planned Parenthood standing to raise the claim, it merely means that if Planned Parenthood had standing to raise the claim, and if it prevailed on that claim, then declaring the statute unconstitutional is the appropriate remedy.
 
 
 91
 In the only case we have before us, Planned Parenthood was not free to compete for funds. The state is no longer reviewing new applications for funds under the Act, but rather is allocating all funds to continue previous grantees' programs. Planned Parenthood challenges a provision which has had no effect on it, and can have no effect on it unless and until the state changes its policy regarding previous grantees, appropriates funds for new grantees, or a previous grantee drops its funded program. We simply have no way of knowing whether any of those contingencies will ever occur, nor do we know what new policy the state might implement if any of those possibilities materialize, nor do we know what effect such policies would have on Planned Parenthood. Moreover, the provision under attack has never been interpreted by state officials charged with administering the program,[4] has never been applied, and may never be applied.
 
 
 92
 An opinion on the merits of this case would amount to nothing but an advisory opinion for Planned Parenthood. The only possible interest Planned Parenthood has in discovering at this point in time whether the Act is unconstitutional is that such an opinion would help it decide whether to continue making applications against the advent that new funds might become available. That kind of legal advice it can obtain from counsel, not from a court of the United States.
 
 
 93
 My brother Posner apparently agrees that Planned Parenthood lacks standing on the record before us, unable to ignore the fact that the application was denied due to the priority funding policy. However, he draws on experience with "nonprofit service organizations such as Planned Parenthood" and hypothesizes that the only realistic reason for Planned Parenthood's failure to apply for funds for years was the existence of the provision it now seeks to challenge. The other possible reasons that an organization might decide against submitting a proposal for public funding--including the possibility that a decision was not even made the first years--are deemed "pretty unrealistic."
 
 
 94
 If Planned Parenthood in fact made a conscious decision against applying for funding because of the provision it challenges, one would think that an organization which Judge Posner assumes later applied for funding solely to enhance its standing to sue[5] would deem that fact relevant and include it in its complaint after it was denied funding on an independent ground. Of course, we do not know the reason (assuming a reasoned decision was made) that Planned Parenthood did not submit an application earlier, and as Judge Cudahy points out, probably will never know. In any event, we are unaware of the reason because Planned Parenthood failed to disclose it. It is no answer to say that defendant's failure to contest standing below lulled Planned Parenthood into thinking it need not present evidence on the question, for an allegation in the complaint would have sufficed as an initial matter and it was plaintiff's clear duty to allege such facts. "It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." Warth v. Seldin, 422 U.S. 490, 518, 95 S.Ct. 2197, 2215, 45 L.Ed.2d 343 (1975). This complainant has not done so.
 
 
 95
 While it would have been within the district court's authority to allow or to require plaintiff to supply further particularized factual allegations, id. at 501, 95 S.Ct. at 2206, it is not this court's role on appeal to confer standing by hypothesis, nor to provide plaintiff with an advisory opinion on how a federal judge would draft its complaint and then remand the case to permit plaintiff to parrot the words of the script drafted by such an illustrious legal advisor. It would be appropriate to remand a case for further proceedings on the standing question where plaintiff's factual averments simply lack sufficient specificity, see Havens Realty Corp. v. Coleman, 455 U.S. 363, 374-377, 102 S.Ct. 1114, 1122-24, 71 L.Ed.2d 214 (1982); it is quite a different matter for an appellate court sua sponte to construct a standing theory for plaintiff based on a hypothetical situation which finds no support in the record.
 
 
 96
 In conclusion, the purported bases of standing in this case amount to no more than saying, as did the district court, that the statute's "very existence, without more, constitutes constitutional injury to Planned Parenthood." 531 F.Supp. at 324. The abstract presence of the statute no doubt offends Planned Parenthood, but Planned Parenthood should not be permitted to distort the judicial process into "no more than a vehicle for the vindication of the value interests of concerned bystanders," United States v. SCRAP, 412 U.S. 669, 687, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973).
 
 
 97
 I do not reach the merits of the constitutional questions presented and express no opinion in that regard.
 
 
 98
 POSNER, Circuit Judge.
 
 
 99
 The statute at issue in this case, Ill.Rev.Stat.1981, ch. 111 1/2, Secs. 4601-100 et seq., creates a program for state funding of organizations that offer assistance in "problem pregnancies," provided the organization does not "refer or counsel for abortion." Sec. 4604-100. Planned Parenthood has standing to challenge this proviso if there is a reasonable probability that striking it down would result in a tangible benefit to Planned Parenthood: namely, receiving money under the program. I do not think Planned Parenthood has to show that it will be certain to receive money if the proviso is struck down; but if that is only a remote possibility, Planned Parenthood's tangible stake in the outcome of this lawsuit is too slight to give it standing.
 
 
 100
 This much I expect is common ground among the judges of this panel and the disagreement is over whether Planned Parenthood has shown a reasonable probability that it will obtain funds if the proviso that disqualifies it is invalidated. If Planned Parenthood had never filed an application for funding under the statute I would agree that it has made the required showing. The statute disqualifies any organization that does abortion counseling, and there is undisputed evidence that Planned Parenthood does but is otherwise qualified to receive funds under the statute. I do not find any ambiguity in the statute that might permit an interpretation under which Planned Parenthood might qualify; I note that if there were, this would argue for abstention rather than outright dismissal.
 
 
 101
 The case is not like Menora v. Illinois High School Ass'n, 683 F.2d 1030 (7th Cir.1982). A rule of a high school athletic association banned, ostensibly in the interest of promoting safety, the wearing of headwear while playing basketball. The rule was invoked against an insecure, and hence possibly unsafe, form of headwear worn by orthodox Jews. We pointed out that if a safe form of headwear was proposed, the Association might well decide to waive its rule to the extent necessary to accommodate the sincere religious belief of orthodox Jews that they must keep their heads covered while playing basketball. In the present case, public officials would be flouting an unequivocal statutory command if they gave money to Planned Parenthood to assist "problem pregnancies." The probability they would do so is too slight to require that Planned Parenthood make the gesture--which would be an empty one--of applying for funds. It is the same principle on which exhaustion of administrative remedies is not required when it would be futile. See, e.g., Continental Can Co., U.S.A. v. Marshall, 603 F.2d 590, 597 (7th Cir.1979).
 
 
 102
 Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 166-67, 92 S.Ct. 1965, 1968, 32 L.Ed.2d 627 (1972), does not require a different conclusion. A black man who had been denied service in a whites-only club as the guest of a member sued the club. The Court held that he had standing to complain about the denial of service to him but not about the club's membership policy; he "was not injured by Moose Lodge's membership policy since he never sought to become a member." Id. at 167, 92 S.Ct. at 1968. At least so far as one can tell from the opinions in the case, there was no evidence that Mr. Irvis wanted to be a Moose; not everyone does. One of the dissenting opinions assumes he did not; it argues that Irvis had standing on the distinct ground that the existence of the discriminatory membership policy was an affront, and hence an injury, to all black people. See 407 U.S. at 183 n. 4, 92 S.Ct. at 1977 n. 4. But there is little doubt that Planned Parenthood would want to get money from the State of Illinois under a program that it was qualified to participate in (as it would be if it were not for the allegedly unconstitutional provision)--or rather, there would be no doubt if Planned Parenthood had not filed an application for funds.
 
 
 103
 That it did apply is a fact we may not ignore. The timing and content of the application raise questions about Planned Parenthood's standing. The Illinois statute became effective on November 1, 1979, but Planned Parenthood did not apply until March 31, 1981. Why did it not apply sooner? Could it be that contrary to one's natural expectation it did not want money for a "problem pregnancies" program earlier? And why, when it did apply, did it submit just a proposal that included abortion counseling? It could have applied in the alternative for funds to support a program that did not include abortion counseling. One cannot help wondering why it did not when it is challenging the abortion-counseling provision in part as a penalty on the exercise of the constitutional rights of applicants under the statute who do not ask for funds for abortion counseling.
 
 
 104
 The following hypothesis is consistent with all of the facts in the record of this case, including the application. When the statute was first passed Planned Parenthood did not apply for money because it was not at that time interested in formulating a proposal that would (were it not for the abortion-counseling provision) have qualified under the statute. Its funding needs changed and in 1981 it decided it was interested in getting money under the statute but only for a program that included abortion counseling. But by then the state was not funding any new applicants, and probably it would never again do so.
 
 
 105
 If these are the facts, Planned Parenthood has standing neither to make the penalty argument, since the assumed facts imply that Planned Parenthood has no interest in applying for funds to support any program that does not include abortion counseling, nor to complain about the denial of funds for abortion counseling. Under the assumed facts the denial of Planned Parenthood's 1981 application was based on an independent and constitutionally adequate state ground. The regulations promulgated under the statute provide that "reapplications for continued funding will receive priority consideration in succeeding years." In the first year of the program the state appropriated $250,000 to fund it, all but $44 of which went to five applicants. In the second year, the year in which Planned Parenthood applied and was turned down, the appropriation was again $250,000 and it went--every cent of it--to the same five organizations, all of which had applied for continued funding. Maybe in future years more money will be appropriated for the program, one or more of the existing recipients will not reapply, or the regulation giving priority to previous recipients will be rescinded; but maybe no new applicant will ever be funded.
 
 
 106
 The record does not enable an estimation of the probability that Planned Parenthood will ever get money under the statute if the abortion-counseling provision is invalidated. As I said earlier, I do not believe that Planned Parenthood's standing to sue depends on its being able to prove that it is certain to be funded if it wins this suit. If a public university had a policy of not admitting any blacks to its medical school, a black would not lack standing to challenge the constitutionality of this policy merely because he might not be admitted if the policy were abandoned. See Regents of Univ. of California v. Bakke, 438 U.S. 265, 280-81 n. 14, 98 S.Ct. 2733, 2742-43 n. 14, 57 L.Ed.2d 750 (1978). But he would not have standing if he was two years old. If it is highly unlikely that any new applicant for funds under the State of Illinois' "problem pregnancies" program will ever get funded, not because it does abortion counseling but because, for reasons unrelated to the constitutionality of the statute, it did not apply for and receive funds previously, then I do not think it would have standing to challenge the constitutionality of the statute. And that may be the case here.
 
 
 107
 All this is as I have said consistent with what little evidence the record contains relating to the issue of standing. But it will also strike anyone who has had any experience with nonprofit service organizations such as Planned Parenthood as being pretty unrealistic, and I do not suppose that judges must always be stifling the promptings of common sense. An alternative and more realistic hypothesis runs along the following lines. Nonprofit organizations in general and Planned Parenthood in particular are always on the lookout for new sources of money. The eligibility criteria of Illinois' "problem pregnancy" program fit Planned Parenthood like a glove except for the disqualification of organizations that do abortion counseling, and therefore the only reason Planned Parenthood did not apply for funds under the program at the outset was that it knew it was disqualified by the allegedly unconstitutional statutory provision. But when Planned Parenthood geared up to bring this lawsuit it decided (in retrospect misguidedly) that its standing to sue would be improved if it gave the state a chance to reject a concrete application for funds. It did not realize that it was handing the state a golden opportunity to deny it funds on an apparently independent, constitutionally permissible basis, but one that is not really independent if as I am now assuming Planned Parenthood did not apply earlier only because an unconstitutional provision disqualified it from applying. I further assume that although Planned Parenthood's application for funds included abortion counseling, as it had to if Planned Parenthood wanted to challenge the statute as a violation of its constitutional right to use state funds for this purpose, Planned Parenthood will reapply for funds and agree not to use them for abortion counseling if the statute is invalidated on the narrower ground (also pressed by Planned Parenthood) that it penalizes organizations which provide such counseling with their own money. Planned Parenthood will agree to this because any funds that it receives from the state, restricted though they may be, will free up other funds to use in paying the costs of abortion counseling.
 
 
 108
 If these facts are true then Planned Parenthood has standing to raise all the issues it has raised. And I think it more probable that this version of the facts is true than that the alternative version which I sketched earlier is true. But I do not see why the choice has to be made on the basis of conjecture, when we can remand the case to the district court for the taking of evidence on the standing issue. Planned Parenthood will have shown that it has standing to raise all of the issues it has tried to raise before us if on remand it shows (1) that it did not apply for funds promptly upon passage of the statute because it thought it was disqualified by the abortion-counseling provision, and (2) that if that provision is held to be unconstitutional only when used to prevent an applicant from using its own funds for abortion counseling Planned Parenthood will submit a proposal that does not involve abortion counseling or referral. Even if the facts developed on remand show that Planned Parenthood initially did not apply for funds for reasons unrelated to its certain disqualification, it would have standing to sue if it could show that the state's decision to confine funding in 1981 to previous recipients was likely to be reversed in subsequent years.
 
 
 109
 We could of course just say to Planned Parenthood, you had the burden of proving standing, you failed to carry it, the case is dismissed. Often when a case is dismissed on jurisdictional grounds the plaintiff can start over in some other forum, but a dismissal based on a finding that Planned Parenthood had failed to prove that it had standing to sue would bar it under the principles of collateral estoppel from refiling its suit. I would be content with this result if I thought it likely that Planned Parenthood does not in fact have standing. But on the contrary I think it probably does although it has not yet proved that it does, and I am reluctant to use the allocation of the burden of proof to reach a result that probably is wrong. We have, and in this case should exercise, the power to order an evidentiary hearing in the district court on the issue of standing. "[I]t is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing." Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). This seems to me a clear case where that power should have been exercised. All other considerations aside, I note that the state did not contest Planned Parenthood's standing. This may have lulled Planned Parenthood into thinking it did not have to introduce evidence of standing that for all we know it has in abundance.
 
 
 
 [1]
 The stated purpose of the Act is as follows:
 (1) To establish better linkages among existing programs in order to expand and improve the availability of, and access to, needed comprehensive community services which assist problem pregnancies and to obtain proper care and assistance to those persons in need to become productive independent contributors to family and community life;
 (2) To expand the availability of community services that are essential to that objective; and
 (3) To promote innovative, comprehensive and integrated approaches to the delivery of such services.
 Ill.Rev.Stat. ch. 111 1/2, Sec. 4602-100(B) (Supp.1980).
 
 
 [2]
 This case presents an injury which is substantially more concrete in nature than the very generalized "chilling" effect on first amendment rights which the Supreme Court found insufficient to create a justiciable controversy in Laird v. Tatum, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). In Laird, the plaintiffs sought to stop domestic surveillance activities of the Department of the Army's Intelligence Unit. Jurisdiction of the federal courts was based upon the chilling effect the mere existence of these activities had on the exercise of the plaintiffs' first amendment rights. The Court found that allegations of a "subjective chill" were "not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." 408 U.S. at 13-14, 92 S.Ct. at 2325-2326
 In the instant case, the challenged statute has a direct and objective impact upon the activities of Planned Parenthood. Unlike the "subjective chill" the plaintiffs in Laird alleged, the statute in question here completely precludes any part of Planned Parenthood from engaging in any form of abortion counseling if the organization wishes to receive funds under the state program. There is no need to predicate standing here merely on the subjective chilling from which Planned Parenthood is also suffering; the statute imposes wholly sufficient objective harm directly upon Planned Parenthood.
 
 
 [3]
 Planned Parenthood's 1981 application was denied on the grounds that Rule 204 of the Rules and Regulations adopted by the Illinois Department of Health to administer the Problem Pregnancy Health Services Care Act created a preference for programs that had already received funding under the Act in prior years. Because 1981 was the first year in which Planned Parenthood applied for funds, its application was denied in favor of the five organizations which had received funds in prior years. See Affidavit of Dr. Turnode, Chief of Division of Family Health, Illinois Department of Public Health. This basis for the prior denial, however, in no way indicates what action the state will take in years in which enough funds are made available under the Act so that the priority rule of Rule 204 does not prevent grants being made to new and additional organizations
 
 
 [4]
 Our recent decision in International Union, UAW v. Johnson, 674 F.2d 1195 (7th Cir.1982), does not conflict with this principle. In Johnson, the plaintiffs challenged the validity of provisions in two Illinois statutes regarding the eligibility of women on pregnancy leave to receive unemployment benefits. One statutory requirement for eligibility was that the applicant be "able to work, and ... available for work; provided that during the period in question [he or she] was actively seeking work." 674 F.2d at 1197. The plaintiffs stipulated that they had not actively sought work during the period of pregnancy-related unemployment for which they sought benefits. This court held that the plaintiffs consequently lacked standing to challenge the pregnancy-leave limitations. Having stipulated that they could not comply with the "actively seeking work" requirement of the statute, the plaintiffs would not be entitled to benefits even if they succeeded in eliminating the pregnancy-leave provisions. In the case before us there has been no stipulation as to the ineligibility under the statute. Thus, unlike the Johnson case, a decision as to the matter in contention, in this case the constitutionality of section 4604-100, will significantly change the position plaintiffs are in. Whereas in Johnson a favorable decision would still have left plaintiffs completely unable to qualify for the unemployment benefits they sought, a favorable decision here will place Planned Parenthood in precisely the position it seeks to be in: able to file an application and compete with pregnancy-care programs for whatever funds the state makes available under the Act
 
 
 [5]
 Appellant Care Center argues in its brief that standing for Planned Parenthood had to be based upon the relaxed standards of standing utilized in "overbreadth" cases, and that this case was an inappropriate setting for utilizing this type of "jus tertii" standing. Intervenor's Reply Brief at 13-17. We need not consider whether this case fits within the doctrine of such cases as Broadwick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), or Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980), because appellants' argument is based upon a fundamental misconception of the type of injury at stake in this case
 Planned Parenthood is here asserting an individualized direct injury to its own organizational interests. Contrary to appellants' assumption, Planned Parenthood need not base its claim for relief upon the rights of other similarly situated, but absent, parties. There is thus no need to consider how the complexities of "jus tertii" standing would apply to this case, other than to note the protectiveness towards first amendment rights which such a liberal standing doctrine evidences. See, e.g., Genusa v. City of Peoria, 619 F.2d 1203 (7th Cir.1980); Soglin v. Kauffman, 418 F.2d 163 (7th Cir.1969).
 
 
 [6]
 Appellants also argue that Planned Parenthood does not have standing due to the content of the application for funds which was actually considered and denied. Appellant Care Center's Brief at 11. Appellant Care Center claims that there is no "case or controversy" until Planned Parenthood submits a request for funds for a separate program which excludes abortion counseling and referrals. Brief at 11. I think it futile, however, and a needless waste of judicial time and resources to dismiss this case on such grounds. This would merely prompt an exercise in paper-shuffling; Planned Parenthood would simply re-file an amended application which would again be denied. Fortunately, the panel also does not think it necessary to order such a futile course of action as this
 
 
 [7]
 The Act, as it stands, would prohibit any large organization, such as a regional medical center, which coincidentally included abortion counseling in some portion of one of its programs from receiving any funds from the State under the problem pregnancy program
 
 
 [8]
 In this connection, I have substantial doubts about the efficacy of the remand we are ordering. The "true," "real," or "authentic" facts about what Planned Parenthood did and "thought" three and four years ago are unlikely ever to be truly "known" with any degree of certainty or reliability. The information which Judge Posner seeks strikes me as the type of information which is essentially lost in the ambiguity of time, and thus not discoverable in an advisory proceeding. I am hard pressed to understand exactly what Judge Posner wants the district court to do: it seems likely to me that questions about an organization's intent at a particular decision point three or four years ago can only be answered by unprovable (and essentially unchallengeable) assertions by the organization about what might have been in the minds of its leaders at the time. Lacking documentary evidence, these assertions can hardly be meaningfully contested by an adversary who produces witnesses claiming to know what other people were thinking or doing three or four years earlier. Thus, I see little point in ordering the district court to embark on a proceeding which is very unlikely to produce useful or persuasive facts
 
 
 [9]
 There actually is no legitimate construction of Sec. 4604-100 which would "save" the statute. The state would have to completely ignore the statute's clear prohibition in order to administer the problem pregnancy grant program in a constitutional manner. Even if it were possible to construe the statute in a constitutional manner, I would be reluctant to engage in such a task. Considerations of comity, separation of powers and judicial restraint make me wary of acting in a way that "substitute[s] the judicial for the legislative department." See L. TRIBE, AMERICAN CONSTITUTIONAL LAW 717 (1978), quoting United States v. Reese, 92 U.S. 214, 221, 23 L.Ed. 563 (1875)
 
 
 [10]
 On the facts before us, there is no evidence that the program, or any recipient of funding under the program, actively counsels against abortions or that women have actually been subjected to misleading information or deception. A case of active interference with the right to freely consider the abortion option is not presently before us, and I express no opinion as to the possible outcome of such a case
 
 
 [11]
 Again, on the record before us, there is no evidence that recipients of funding under the program, such as intervenor Care Center, utilize the funds to provide misleading negative information about abortions. I express no opinion as to the outcome of a case where such action was present
 
 
 [12]
 "The power of the State to compel attendance at some school and to make reasonable regulations for all schools, including a requirement that they shall give instructions in English, is not questioned. Nor has challenge been made of the State's power to prescribe a curriculum for institutions which it supports." 262 U.S. at 402, 43 S.Ct. at 627
 
 
 [13]
 Any showing that state funding to any degree dominated or preempted communication on the problems of pregnancy or was used negatively to intimidate or restrict women in the exercise of their freedom of choice would present quite a different case than the one which appears to be before us
 
 
 [14]
 Presumably, although this is not before us, the state might have chosen to fund abortion counseling and not the alternatives. The state, as the organized community, is entitled to have legitimate preferences in these matters
 
 
 [1]
 Planned Parenthood, it should be noted, does not even suggest that the stated reason for denying its 1981 application was a pretext. Nor is there any indication in the record of this case that Planned Parenthood was deterred from applying because of the provision it seeks to challenge; any such assertion now, even assuming its relevance to the standing issue, would be suspect at best in light of the fact that the existence of the provision did not deter Planned Parenthood from applying for funds in 1981, and would come too late in any event given plaintiff's burden to establish the requisite facts for standing
 
 
 [2]
 I briefly note the second ground advanced for finding standing: that the invalidation of Sec. 4604-100 will give Planned Parenthood the ability to have its 1981 application considered on its merits. Manifestly, it will not have that effect. That application was denied on a ground having nothing whatever to do with Planned Parenthood's abortion counseling and striking down the provision in question will have no more effect on that application than would a holding that the sky is green. The attempt to distinguish International Union v. Johnson, 674 F.2d 1195 (7th Cir.1982), is completely wide of the mark. The attempt to distinguish Johnson regarding the second ground for finding standing merely restates the first ground for standing--concerning plaintiff's ability to compete for funds in the future. Johnson did not address that question, but that question is not the basis of the second "separate" basis of standing--the "injury [plaintiff] suffered when its 1981 application for funds was denied." Johnson is dispositive of that possible basis for standing and the fact that there was a formal stipulation in Johnson is plainly no basis to distinguish that case. Here, there is no dispute that the 1981 application was denied because of previous grantees being provided funding. Declaring the statute unconstitutional will have no effect whatsoever on plaintiff's 1981 application, just as a declaration of unconstitutionality in Johnson would have had no effect on the plaintiff's requests for benefits. The attempt to distinguish Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), is equally wide of the mark: again it is stated that in the instant case "there has already been a denial of equal access to funding" when manifestly there has not been under the challenged provision
 
 
 [3]
 In this regard, reliance on Regents of the University of California v. Bakke, 438 U.S. 265, 280-81 n. 14, 98 S.Ct. 2733, 2742-43 n. 14, 57 L.Ed.2d 750 (1978) (plurality opinion), is misplaced. Bakke in fact was denied the ability to compete freely for all the places in the medical school class on the basis of his race, the very classification he sought to challenge. Planned Parenthood in fact was not denied the ability to compete freely for funds on the basis of the provision which it seeks to challenge. Bakke presented an actual controversy; Planned Parenthood does not. If Bakke's application for medical school had been denied pursuant to a policy of only considering applicants who had been rejected the previous year and Bakke had not submitted such an application, the case would be analogous to this one, and Bakke would not have been heard to complain of the racial classification in the courts of the United States
 Larson v. Valente, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), also relied upon for finding standing, not only fails to provide support for that conclusion, but is actually inconsistent with it. In Larson, plaintiff sought to challenge the validity of a statutory provision which provided that only those religious organizations receiving more than half of their contributions from certain sources would be exempt from the reporting requirements generally required of charitable organizations. The court found that plaintiff had standing to challenge this provision because this provision in fact was the "sole basis" for the state's attempt to compel plaintiff to register. Id. at 242, 102 S.Ct. at 1682. The fact that plaintiff might still be compelled to register on another ground--that it was not a religious organization within the meaning of another provision of the Act--did not preclude plaintiff from challenging the provision which defendant actually invoked. Larson would be analogous to the instant case if plaintiff had been compelled to register on the ground that it was not a religious organization, and then sought to challenge the fifty per cent rule; plainly following Larson's standing analysis, under those circumstances plaintiff would not have standing to raise such a claim, for then, plaintiff would not have been injured by the provision it sought to challenge, nor would a holding that such a rule was invalid have any effect on plaintiff.
 
 
 [4]
 The idea that a limiting construction of the language is possible is blithely dismissed. I am always skeptical when the contention is made that statutory language is totally unambiguous and that a statute, on its face, clearly applies to given situations. A statute, on its face, accomplishes nothing. It must be given life by those charged with its enforcement. Those charged with the enforcement of this language are not, as is this court, limited by notions of comity in interpreting it. If the language does raise constitutional questions, state officials have a great incentive to construe it narrowly in light of the inseverability clause of the Act. Here, the statutory language prohibits grants to agencies which "counsel or refer for abortion." I do not think that it would be outlandish for a state official to interpret that language merely to preclude funding for organizations which make affirmative recommendations to clients to obtain abortions, construing the word "for" to mean in favor of. The Act does not say counsel regarding abortion. With respect to referrals, a state official might interpret the language merely to preclude referrals to specific abortion clinics or physicians, but permit organizations to advise a woman to consult her own physician concerning the best place to obtain one. I express no view whatsoever on the constitutionality of such a scheme, nor do I suggest that I would adopt such interpretations, but I do apprehend that such interpretations would radically alter the possible bases of constitutional challenge of the Act. Until this language is given life through its application by those charged with administering this program, this court should be wary of entertaining a constitutional challenge of it
 
 
 [5]
 Of course, Judge Posner views this action by Planned Parenthood as a serious tactical blunder, believing that if Planned Parenthood had never applied for funding it could nevertheless challenge the constitutionality of the statute. That question itself is a constitutional one which we need not reach on the record before us, though I note in Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), the Court held that a failure to make an application precluded a challenge to an eligibility requirement. Significantly, the Court did not remand the case back to the district court in order to permit the plaintiff to allege that the reason he did not submit an application was due to the policy he sought to challenge