**PLANNED PARENTHOOD ASSOCIATION CHICAGO AREA, an Illinois not-for-profit corporation, Plaintiff,**

v.

**William L. KEMPINERS, individually and as Director of the Illinois Department of Public Health, Defendant,**

and

**Care Center of Springfield, Inc., Intervenor-Defendant.**

No. 81 C 3332.

United States District Court, N.D. Illinois, E.D.

Aug. 9, 1983.

Terry Rose Saunders, Jenner & Block, Lois Lipton, Roger Baldwin Foundation, American Civil Liberties Union, Chicago, Ill., for plaintiff.

Frona Daskal, Asst. Atty. Gen., Chicago, Ill., for defendant Kempiners.

Thomas Marzen, Americans United for Life, Chicago, Ill., for intervenor-defendant.

## MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

This case is before us on remand from the United States Court of Appeals. *See Planned Parenthood Association v. Kempiners*, 700 F.2d 1115 (7th Cir.1983) (per curiam), *vacating and remanding* 531 F.Supp. 320 (N.D.Ill.1981). At issue is the constitutionality of Ill.Rev.Stat. ch. 111½, § 4604-100 (1981), which prohibits from receiving grants under the Illinois Problem Pregnancy Health Services and Care Act any applicant that engages in abortion counseling or referral activities.

### I

The court of appeals was unable to produce a single opinion in the appeal from our initial decision in plaintiff's favor. Judge Cudahy was of the view that the judgment should be affirmed. Judge Eschbach was of the view that the judgment should be vacated and the case remanded to this court with directions that the complaint be dismissed on the ground that plaintiff lacked standing to challenge the statute. Judge Posner was of the view that the judgment should be vacated and the case remanded for a hearing on the question of plaintiff's standing. The court's brief per curiam opinion indicates that to enable the case to be decided by a majority vote, Judge Cudahy agreed to defer to Judge Posner's view that additional evidence should be taken on the issue of plaintiff's standing. Accordingly, the court remanded the case for an evidentiary hearing to explore the questions of standing raised in Judge Posner's separate opinion.

In his separate opinion, Judge Posner began by noting that the question of plaintiff's standing hinged on the question whether plaintiff might realize some tangible benefit if the statute was struck down. *See* 700 F.2d at 1135. Judge Posner noted that, in 1981, when plaintiff first applied for funds under the Act, its application was denied for the stated reason that the applicants who had successfully applied for funds in 1980 had priority over plaintiff. If plaintiff's lack of success as an applicant was due to its failure to apply for funds in 1980, rather than the challenged statute, Judge Posner believed that plaintiff would lack standing to challenge the statute. *See id.* at 1136–37. However, he also noted that the likelihood that plaintiff in fact was not injured by the statute was probably remote. He described the probable course of events that led to the denial of plaintiff's application as follows.

An alternative and more realistic hypothesis runs along the following lines. Nonprofit organizations in general and Planned Parenthood in particular are always on the lookout for new sources of money. The eligibility criteria of Illinois' "problem pregnancy" program fit Planned Parenthood like a glove except for the disqualification of organizations that do abortion counseling, and therefore the only reason Planned Parenthood did not apply for funds under the program at the outset was that it knew it was disqualified by the allegedly unconstitutional statutory provision. But when Planned Parenthood geared up to bring this lawsuit it decided (in retrospect misguidedly) that its standing to sue would be improved if it gave the state a concrete application for funds. It did not realize that it was handing the state a golden opportunity to deny it funds on an apparently independént, constitutionally permissible basis, but one that is not really independent if as I am now assuming Planned Parenthood did not apply earlier only because an unconstitutional provision disqualified it from applying. I further assume that although Planned Parenthood's application for funds included abortion counseling, as it had to if Planned Parenthood wanted to challenge the statute as a violation of its constitu-

tional right to use state funds for this purpose, Planned Parenthood will reapply for funds and agree not to use them for abortion counseling if the statute is invalidated on the narrower ground (also pressed by Planned Parenthood) that it penalizes organizations which provide such counseling with their own money. Planned Parenthood will agree to this because any funds that it receives from the state, restricted though they may be, will free up other funds to use in·paying the costs of abortion counseling.

*Id.* at 1137.

Judge Posner's opinion stated, for the court, that on remand it should be determined if the above hypothesis were correct. He concluded,

Planned Parenthood will have shown that it has standing to raise all of the issues it has tried to raise before us if on remand it shows (1) that it did not apply for funds promptly upon passage of the statute because it thought it was disqualified by the abortion-counseling program, and (2) that if that provision is held to be unconstitutional only when used to prevent an applicant from using its own funds for abortion counseling Planned Parenthood will submit a proposal that does not involve abortion counseling or referral.

700 F.2d at 1137–38.

The evidentiary hearing described by Judge Posner was held on May 25, 1983. The only witness was Norman Levine, plaintiff's executive director. Mr. Levine testified that plaintiff did not apply for funding in 1979 or 1980 because it assumed that it was not eligible for funding because of the challenged statute. T. 5. When it did apply in 1981, it did so on the advice of counsel, solely for the purpose of bringing this lawsuit. T. 6–7. He also testified that Planned Parenthood would be willing to submit an application for funds that did not involve state funding of abortion counseling or referral, if the state were to remove its disqualification from state funding. T. 7–8, 21. This uncontroverted testimony indicates both that plaintiff did not promptly apply for funds solely because it thought it was ineligible because of the allegedly unconstitutional statute, and that plaintiff is willing to prepare an application which would not involve the use of state funds for abortion counseling and referral services if the statute is held to be unconstitutional only when it disqualifies applicants that seek to use their own funds for abortion counseling and referral.[1] Under Judge Posner's opinion, plaintiff has standing to raise all the arguments it seeks to raise, despite its failure to submit an application for funds promptly after the Act's passage.[2]

## II

At the hearing, counsel for defendant Kempiners raised the possibility that this case might be moot since, because of fiscal pressures, defendant would not request that any money be appropriated under the Act for the coming fiscal year, meaning that there may be no money for grants under the program during the coming fiscal year. T. 25–28. Counsel at no point argued that the case was moot, or even assured us that there was no realistic possibility that funds would be appropriated under the Act this year. Rather, counsel merely raised the possibility of mootness, without taking the position that the case actually was moot.

---

1. At the hearing, intervenor-defendant challenged the credibility of plaintiff's assurance that it would submit an application that did not provide for the use of state funds for abortion counseling and referral, noting that its 1981 application did call for just that. However, Mr. Levine explained that the 1981 application was prepared solely for the purpose of bringing suit. As Judge Posner noted, plaintiff had to do this if it wanted to assert its right to obtain state funds for use in abortion counseling and referral. There is no reason to believe that a nonprofit organization like plaintiff, always in need of funds, would refuse to submit an application which did not seek the use of state funds for abortion counseling and referral but rather only its own funds if that were necessary for it to obtain funding.

2. *Cf. Nyquist v. Mauclet,* 432 U.S. 1, 6 n. 7, 97 S.Ct. 2120, 2124 n. 7, 53 L.Ed.2d 63 (1977) (plaintiff challenging exclusion of aliens from college loan program has standing despite failure to submit an application because applying would have been futile in light of his alien status).

We invited defendant Kempiners to submit a brief arguing that the case was moot, T. 29–30, but defendant declined our invitation. Nevertheless, since the issue of mootness goes to our subject matter jurisdiction over the case, we consider the question on our own motion.[3]

■ "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969).[4] There can be no doubt that this case still presents a "live" controversy. The challenged statute remains in effect, and the parties continue to disagree as to its constitutionality. The parties remain in an adversarial posture over the merits of this litigation, hence the dispute over the statute's constitutionality remains "live." *See Franks v. Bowman Transportation Co.,* 424 U.S. 747, 755–57, 96 S.Ct. 1251, 1259–61, 47 L.Ed.2d 444 (1976); *Virginia ex rel. Coleman v. Califano,* 631 F.2d 324, 326–27 (4th Cir.1980). Rather, the question posed is whether the unavailability of funds due to the failure to request an appropriation under the Act means that the parties no longer have a legally cognizable interest in the outcome of the case.

The decision not to request any funds under the Act for the coming fiscal year was entirely voluntary; it was in no way compelled by plaintiff or the court.[5] It has long been the general rule that a defendant's voluntary cessation of challenged conduct will not moot a case since otherwise the plaintiff could not obtain any relief while the defendant would remain free to return to its old ways.[6] That rule fully applies here—defendant could always evade a judgment against him simply by defunding the program before it was enjoined, remaining free to refund it after the case against him had been dismissed as moot. Under these circumstances, the case can become moot only if strict conditions are present.

We recognize that, as a general rule, "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.,* does not make the case moot." But jurisdiction, properly acquired, may abate if the case becomes moot because

(1) it can be said with reasonable assurance that "there is no reasonable expectation ..." that the alleged violation will recur, and

(2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.

When both conditions are satisfied it may be said that the case is moot because neither party has a legally cognizable interest in the final determination of the underlying questions of fact and law. *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 633, 73 S.Ct. 894, 897, 898, 97 L.Ed. 1303 (1953)). The burden is on the defendant to demonstrate that the

---

3. *See* Fed.R.Civ.P. 12(b)(1).

4. The Court continues to follow this test of mootness. *See, e.g., Murphy v. Hunt,* 455 U.S. 478, 481, 102 S.Ct. 1181, 1182, 71 L.Ed.2d 353 (1982) (per curiam); *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 396, 100 S.Ct. 1202, 1208, 63 L.Ed.2d 479 (1980).

5. In fact, defendant requested and the General Assembly appropriated funds under the Act for fiscal year 1983 even after the original injunction had issued in this case, though they knew that the funds could not be spent. This shows a commitment to the program on the part of defendant and the legislature.

6. *See City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1982); *Allee v. Medrano,* 416 U.S. 802, 810–11, 94 S.Ct. 2191, 2197–98, 40 L.Ed.2d 566 (1974); *DeFunis v. Odegaard,* 416 U.S. 312, 318, 94 S.Ct. 1704, 1706, 40 L.Ed.2d 164 (1974) (per curiam); *United States v. Concentrated Phosphate Export Ass'n,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968); *Gray v. Sanders,* 372 U.S. 368, 375–76, 83 S.Ct. 801, 805–06, 9 L.Ed.2d 821 (1963); *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); *Walling v. Helmerich,* 323 U.S. 37, 42–43, 65 S.Ct. 11, 14–15, 89 L.Ed. 29 (1944); *Hecht Co. v. Bowles,* 321 U.S. 321, 327, 64 S.Ct. 587, 590, 88 L.Ed. 754 (1944); *United States v. Trans-Missouri Freight Ass'n,* 166 U.S. 290, 309–10, 17 S.Ct. 540, 546–47, 41 L.Ed. 1007 (1897).

case has become moot. *County of Los Angeles,* 440 U.S. at 631, 99 S.Ct. at 1383.

Here, defendant has not discharged his burden of proving that there is no reasonable expectation that defendant will again engage in the challenged conduct. Defendant has provided no assurance that the legislature will not appropriate money under the Act for the coming year, despite the failure to request money. Neither has he assured us that he will not request money under the statute in future years, when budgetary constraints permit it. Since the sums requested in the past under the Act are small in the total picture of state government—$250,000—a slight change in the budgetary posture of the state might suffice to permit an appropriation. At most, defendant may have demonstrated that it is unlikely that the Act will be funded during the coming fiscal year, but he has said nothing about what may happen after that.

Thus, all defendant has raised is the possibility that the Act may not be funded in the coming fiscal year. That does not make the case moot. Even where a defendant has given a firm assurance that it will not engage in the challenged conduct in the future—which defendant Kempiners has not—this is insufficient to moot the case without an additional showing. *See Quern v. Mandley,* 436 U.S. 725, 734 n. 7, 98 S.Ct. 2068, 2074 n. 7, 56 L.Ed.2d 658 (1978); *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); *Halet v. Wend Investment Co.,* 672 F.2d 1305, 1308 (9th Cir.1982).[7] Even defendant's budgetary constraints are insufficient to moot the case. The Supreme Court has held that even where the defendant represents that it would be uneconomical for it to continue to engage in the challenged conduct the case has not been mooted. *United States v. Concentrated Phosphate Export Association,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968). A number of other authorities also indicate that the case is not moot.

For example, in *City of Los Angeles v. Lyons,* —— U.S. ——, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), the district court had enjoined the use of choke holds by the Los Angeles police under circumstances where there is no threat of death or serious bodily injury, and the court of appeals had affirmed it. Subsequently the chief of police voluntarily banned the use of choke holds under any circumstances, and a few days later the board of police commissioners imposed a six-month ban of their use except where the use of deadly force would also be authorized. The board later extended this ban indefinitely. Nevertheless, the Supreme Court held that the case was not moot "since the moratorium by its terms is not permanent. Intervening events have not 'irrevocably eradicated the effects of the alleged violation.' " *Id.* 103 S.Ct. at 1664–65 (quoting *County of Los Angeles,* 440 U.S. at 631, 99 S.Ct. at 1383).[8] Similarly here, the failure to request an appropriation is by its terms not permanent, but limited to a single fiscal year.

Perhaps even more pertinent is *Reeves, Inc. v. Stake,* 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980). For many years South Dakota operated a cement factory. Because of a construction boom in 1978, it found itself unable to fill all orders it received, and adopted a policy of filling orders from its South Dakota customers first. An out-of-state customer challenged this practice under the commerce clause, U.S. Const. art. I, § 8, cl. 3. During the pendency of the case, the shortage subsided and South Dakota abandoned the challenged policy. Nevertheless, the Court held that the case was not moot, since cement shortages could be expected to recur creating a reasonable possibility that, due to economic conditions, South Dakota might one day reinstitute the challenged policy. *Id.* at 434 n. 5, 100 S.Ct. at 2276 n. 5. Here too, defendants' cessa-

---

7. Such assurances might obviate the need for injunctive relief, however, permitting the court to issue only declaratory relief. *See Quern.*

8. *See also Rabinowitz v. Board of Junior College Dist. No. 508,* 507 F.2d 1255 (7th Cir.1975); *Nevada ex rel. Nevada Board of Agriculture v. United States,* 512 F.Supp. 166, 169 (D.Nev. 1981).

tion of the challenged conduct is due to economic conditions that cannot be expected to be permanent. We cannot say that there is no reasonable chance that Illinois' budgetary posture may some day improve so that it once again funds grants under the Act.

In a case on all fours with this one, it was held that although no funds were currently available under a grant program, since the statute authorizing the program remained in effect and applications for grants continued to be made, the case was not moot. *Kelley v. Metropolitan County Board of Education,* 372 F.Supp. 528, 534 (M.D.Tenn. 1973).[9]

In short, it cannot be said that there is no reasonable possibility that the challenged conduct will recur. In light of defendant's past conduct, in which he sought and obtained appropriations even after the program had been enjoined, defendant's failure to assure the court that no money will be spent in the next or future years, and the fact that defendant's budgetary posture is by its terms not permanent, we cannot say that the possibility that defendant will one day resume the challenged conduct is "chimerical." *Poe v. Ullman,* 367 U.S. 497, 508, 81 S.Ct. 1752, 1758, 6 L.Ed.2d 989 (1961) (plurality opinion); *see Carey v. Population Services International,* 431 U.S. 678, 683 n. 3, 97 S.Ct. 2010, 2015 n. 3, 52 L.Ed.2d 675 (1978). Neither is it "imaginary" or "speculative." *See Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 298–303, 99 S.Ct. 2301, 2308–2311, 60 L.Ed.2d 895 (1979); *Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974). "Against this background, it is not 'absolutely clear,' absent the injunction [plaintiff requests], that the allegedly wrongful behavior could not reasonably be expected to recur." *Vitek v. Jones,* 445

U.S. 480, 487, 100 S.Ct. 1254, 1260, 63 L.Ed.2d 552 (1980) (quoting *United States v. Concentrated Phosphate Export Association,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968)). This case is not moot. Accordingly, we proceed again to its merits.

### III

In count I of its complaint, plaintiff contends that Ill.Rev.Stat. ch. 111½, § 4604–100 (1981) violates the due process clause, U.S. Const. amend. XIV, § 1, by penalizing plaintiff for the exercise of protected rights.[10] Even if plaintiff submitted an application that did not require the state to fund abortion counseling and referral services, which Mr. Levine testified it was willing to do, it would be disqualified because it used its own money to provide those services. That is dramatically different from the facts of *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), or *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), where the State refused to fund abortion services but did not disqualify applicants for state funds from receiving any other type of funding simply because they wished to have abortions. In our first opinion, *see* 531 F.Supp. at 325, we recognized, under such circumstances, that the challenged statute creates an unconstitutional penalty on the exercise of constitutional rights. Judge Cudahy, in his separate opinion, *see* 700 F.2d at 1123–25, held that the Act, on its face, imposed such an unconstitutional penalty. Therefore, for the reasons stated in our prior opinion and in Judge Cudahy's separate opinion, we hold that the challenged statute is unconstitutional when used to disqualify an applicant for state funding who does not seek to use state funds for abortion counseling and referral services.

---

**9.** Conversely, if the statute authorizing the problem pregnancy program had been repealed, the case would be moot. *See New Mexico ex rel. New Mexico State Highway Dep't v. Goldschmidt,* 629 F.2d 665 (10th Cir. 1980); *Arkansas ex rel. Arkansas State Highway Comm'n v. Goldschmidt,* 627 F.2d 839 (8th Cir.1980) (per curiam); *Chicago Consortium, Inc. v. Brennan,* 599 F.2d 138 (7th Cir.1979) (per curiam).

**10.** In our first opinion, we held that plaintiff had standing not only to assert not only its own rights, but the rights of its clients. *See* 531 F.Supp. at 324 n. 3. Nothing in Judge Posner's or Judge Cudahy's opinions takes issue with this holding. Therefore we adhere to it as we discuss the merits. The court of appeals, in its per curiam opinion, authorized us to reexamine the merits on remand, should we wish to do so.

## IV

In count II of the complaint, plaintiff alleges that since the Illinois Act prohibits abortion counseling and referral by grantees who provide counseling to pregnant women, it directly interferes with the constitutional right of women to be able to make a fully informed decision as to whether to carry a pregnancy to term. In our earlier opinion we held that both the first and the fourteenth amendments protected the right of a woman to receive full and accurate information about her decision whether to carry a pregnancy to term, and that the state's attempt to create a program in which women would not receive complete information directly interfered with that right.

In his separate opinion, Judge Cudahy did not disagree with our conclusion that both the first and the fourteenth amendments protect the right of a woman to decide whether to bear or beget a child without direct interference from the state. He also noted that the constitutionality of the Illinois statute under both amendments turns on whether the state is merely declining to subsidize protected activity because of its legitimate interest in protecting potential life, or whether it is directly interfering with women's right to make their "begetting choice" free of state interference. However, Judge Cudahy was of the view that Illinois has not directly interfered with the exercise of constitutional rights but merely declined to subsidize those rights.

The first reason Judge Cudahy expressed for his conclusion was that the state's failure to subsidize abortion counseling services merely leaves pregnant a woman with the same range of choices as she would have had had the state subsidized no pregnancy counseling at all. There are two responses to this view.

First, it is not true that a refusal to subsidize must be upheld if it does not leave persons any worse off than had there been no subsidy at all. As we pointed out in the prior opinion, the Supreme Court has held

several times that "[r]efusals to subsidize, if based on constitutionally impermissible criteria, may be invalidated ...." 531 F.Supp. at 326. We also pointed out that it has long been clear that government may not deny a person a governmental benefit for a constitutionally impermissible reason. *Id.* at 326–27. It is not a sufficient answer that the challenged conduct involves only a refusal to subsidize. If that were enough, the state could, for example, deny welfare to blacks, Republicans, or persons who merely spoke out against the incumbent administration's policies, and defend itself by arguing that persons were no worse off than if the state had provided no welfare at all.[11] The appropriate test is not whether the challenged conduct involves a refusal to subsidize, but rather whether that refusal is based on a constitutionally permissible criterion.

Second, it is not necessarily true that Illinois has left a pregnant "woman with at least the same range of choice in deciding whether to obtain a[n] ... abortion as she would have had if [Illinois] had chosen to subsidize no health care costs at all." *Harris v. McRae,* 448 U.S. at 317, 100 S.Ct. at 2688. Before Illinois began its problem pregnancy program, women could make their decision whether to carry a pregnancy to term entirely free from state interference. Now, the state "assists" women in making this decision by providing counseling that discusses only the birth, and not the abortion option. Abortion is a forbidden topic that the counselor may not even mention. If Illinois is, as alleged, manipulating women's decisions by providing counseling that does not permit them to make fully informed decisions, then women's "range of choice" has been adversely affected by the program.

Judge Cudahy's second reason for rejecting the claim made in count II was that the state had not directly affected women's rights to obtain full and complete pregnancy options counseling, but rather had decid-

---

**11.** In fact, Judge Cudahy recognized as much, in that he was willing to strike down the statute as a forbidden penalty on the exercise of plaintiff's rights although the statute leaves plaintiff no worse off than if the state had subsidized no pregnancy related services at all.

ed only to fund one type of counseling—counseling for childbirth and not abortion—rather than the neutral "options counseling" which plaintiff provides, see 531 F.Supp. at 322. This decision was constitutionally permissible, in his view, as an expression of the state's legitimate interest in protecting potential life.

Judge Cudahy did not dispute our conclusion that the Constitution protects the right of a pregnant woman to decide for herself whether to carry a pregnancy to term free from state interference. Indeed, the Supreme Court recently reaffirmed this proposition "[A] pregnant woman must be permitted, in consultation with her physician, to decide to have an abortion and effectuate that decision 'free from interference by the State.'" *City of Akron v. Akron Center for Reproductive Health, Inc.,* —— U.S. ——, ——, 103 S.Ct. 2481, 2493, 76 L.Ed.2d 687 (1983) (quoting *Roe v. Wade,* 410 U.S. 113, 163, 93 S.Ct. 705, 731, 35 L.Ed.2d 147 (1973)).[12] Accordingly, any state interference in the abortion decision is subject to strict constitutional scrutiny. *See Scheinberg v. Smith,* 659 F.2d 476, 482 (5th Cir. 1981); *Womens Services, P.C. v. Thone,* 636 F.2d 206, 10 (8th Cir.1980) (per curiam), *vacated on other grounds,* 452 U.S. 911, 101 S.Ct. 3043, 69 L.Ed.2d 414 (1981); *Charles v. Carey,* 627 F.2d 772, 777 (7th Cir.1980).

Judge Cudahy urged that the Illinois statute did not directly interfere with the counseling relationship or the abortion decision because women in the program can still seek abortion counseling and referral services elsewhere. With respect, we must disagree. This argument "ignores the potential impacts of placing 'obstacles in the path of the doctor upon whom [the woman is] entitled to rely for advice in connection with her decision.'" *Charles v. Carey,* 627 F.2d at 782 (quoting *Whalen v. Roe,* 429 U.S. 589, 604 n. 33, 97 S.Ct. 869, 879 n. 33, 51 L.Ed.2d 64 (1977)). In *City of Akron* the Supreme Court struck down an ordinance requiring the pregnant woman's attending physician to give her certain information which might discourage her from having an abortion. Despite the fact that women remained free to disregard that information, or to seek additional counseling or information, the Court held that the ordinance requirement had an impermissible impact on the abortion decision. The Court has always stressed the centrality of the physician's role "both in consulting with the woman about whether or not to have an abortion, and in determining how any abortion was to be carried out." *E.g., Colautti v. Franklin,* 439 U.S. 379, 387, 99 S.Ct. 675, 681, 58 L.Ed.2d 596 (1979). The Court held that requiring the attending physician to provide this information meant the state had impermissibly attempted "to influence the woman's informed choice between abortion and childbirth," —— U.S. at ——, 103 S.Ct. at 2500, both by giving her information designed to discourage abortion and by confining the medical judgment of the attending physician upon whom the woman is entitled to rely for accurate and complete advice on her options. *See id.* at ——— ——, 103 S.Ct. at 2500–01. Moreover, in *City of Akron* the Court held that these principles are applicable not only to the attending physician, but to any qualified counselor, who may serve the same functions as a physician with respect to the options counseling process. *See id.* at ——— ——, 103 S.Ct. at 2501–04.[13] It is blinking at reality to say that a woman's counselor, who of necessity occupies a position of great trust and intimacy, discusses only childbirth and refuses to provide any information on abortion, will not have a critical impact upon the woman's decision whether to carry her pregnancy to term. It was exactly this assumption, that what the counselor tells the woman will have an impact on the abortion decision, that underlay the Court's holding in *City of Akron* that the state may not require the counselor to

---

**12.** The Court also wrote that even "minor regulations on the abortion procedure during the first trimester may not interfere with physician-patient consultation or the woman's choice between abortion and childbirth." —— U.S. at ——, 103 S.Ct. at 2493.

**13.** We anticipated this holding in our prior opinion. *See* 531 F.Supp. at 328 n. 7. No contention is made that plaintiff's counselors are not qualified.

provide information which is designed to discourage abortion. Yet that is what Illinois has done here. Illinois argues that its statute advances its interest in potential life precisely because it may discourage women from having abortions, by providing counseling that advocates only childbirth. Indeed, if the state's program was not designed, and did not in fact tend to discourage abortions, it would not advance its interest in potential life; it would amount to no more than preaching to the converted. The program can advance the state's interest only to the extent that it affects women's decisional processes.[14] The effect on the woman is heightened in that there are circumstances in which abortion is medically necessary for the health of the mother, see McRae v. Califano, 491 F.Supp. 630, 668–90 (E.D.N.Y.), rev'd on other grounds sub nom. Harris v. McRae, 448 U.S. 297, 100 S.Ct. 2701, 65 L.Ed.2d 831 (1980),[15] yet the state funded counselor will be unable to advise the woman of medical factors that counsel against continuation of the pregnancy, much less tell her that abortion is medically advisable. Nor can the counselor refer her to someone who can.

In both Harris v. McRae, 448 U.S. 297, 100 S.Ct. 2701, 65 L.Ed.2d 831 (1980), and Maher v. Roe, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), the state provided financial incentives for indigent pregnant women to choose childbirth over abortion, but left women entirely free to decide on their own whether to avail themselves of those incentives.[16] No effort was made to prevent women from making a fully informed decision whether to accept the incentives.[17] Women in the problem pregnancy program are not left free to decide for themselves whether to have an abortion. They come to counseling, not yet having made a decision whether to carry the pregnancy to term[18] and often not having re-

---

**14.** One might defend the statute on the ground that it is not designed to further the state's interest in potential life, but rather its interest in ensuring the abortion decision is fully informed, by ensuring that women hear the anti-abortion case before they decide to terminate pregnancy. However, that was exactly what the city did in City of Akron—it required women to do just that, but since this resulted in a biased presentation that was designed to discourage abortions, it was held invalid. Perhaps such an argument could be sustained if it could be shown that all women already receive pro-abortion information, so that the state is just evening the scales. However, no such showing has been made, and, in any event, the best way to further the state's interest in informed consent is to ensure that all women hear both sides, rather than only telling them one and hoping they hear the other. Since the statute is not narrowly tailored to fit this interest, but will result in some women making their decision after hearing only one side, it cannot survive strict scrutiny. In any event, defendants have never tried to justify the statute on this ground, and there is nothing in its history to indicate it was passed for this reason. An abortion statute can only be sustained, even on a rational basis test, if it "furthers some legitimate, articulated state purpose," Maher v. Roe, 432 U.S. 464, 470, 97 S.Ct. 2376, 2381, 53 L.Ed.2d 484 (1977) (emphasis supplied) (quoting San Antonio Ind. School Dist. v. Rodriguez, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973)). Here the state has never "articulated" this interest.

**15.** On appeal, the Court did not quarrel with the district court's conclusions that abortions are often medically necessary.

**16.** In McRae, the Court quoted Maher,

The Connecticut regulation before us is different in kind from the laws invalidated in our previous abortion decisions. The Connecticut regulation places no obstacles—absolute or otherwise—in the pregnant woman's path to an abortion. An indigent woman who desires an abortion suffers no disadvantage as a consequence of Connecticut's decision to fund childbirth; she continues as before to be dependent on private sources for the service she desires. The State may have made childbirth a more attractive alternative, but it has imposed no restriction on access to abortions that was not already there.

448 U.S. at 314, 100 S.Ct. at 2687 (quoting 432 U.S. at 474, 97 S.Ct. at 2382–83). Here, the restriction on access to abortion is not caused by a preexisting condition such as indigency, but by a counseling program created by the state. The preexisting condition was one of no state intrusion into the decisional process.

**17.** The financial incentives were pertinent information that any rational decisionmaker would want at hand when choosing between abortion and childbirth; they assisted an informed decision.

**18.** As noted above, if women have already opted for childbirth, the counseling does not protect potential life.

ceived any prior counseling.[19] They are then counseled only to carry the pregnancy to term. That is bound to have a direct impact on the decisional process, especially in light of the centrality of the process as has been acknowledged by the Court on several occasions. In sum, the statute protects the interest in potential life only to the extent that counselors provide an incomplete set of information that is designed to discourage women from having abortions. The ability of women in the program to make their childbirth decision free from state interference is dramatically affected by such counseling, much more so than if the state provided no counseling program at all. This program violates due process for the same reason that any attempt by the state to pursue its interest in potential life by giving women misleading or incomplete information designated to affect their abortion decision does. Such interference in the decisional process, as opposed to providing incentives which the woman herself may decide to accept, free from state interference, is subject to strict scrutiny. Because the state's interest in potential life is not compelling until the third trimester, *e.g.*, *City of Akron*, —— U.S. at ——, 103 S.Ct. at 2490, the Illinois statute cannot survive strict scrutiny. Similarly, such a content based attempt to manipulate the information available to pregnant women violates the first amendment.[20]

## V

In count III, plaintiff claims that the Illinois statute violates the equal protection clause of the fourteenth amendment. For the reasons stated in our prior opinion, *see* 531 F.Supp. at 325, we reject this claim.

## VI

Plaintiff is entitled to judgment on counts I and II of the complaint, defendants to judgment on count III. Ill.Rev.Stat. ch. 111½, § 4604–100 is declared unconstitutional[21] and defendant Kempiners is enjoined from enforcing it. Since plaintiff failed to apply for funding prior to 1981 solely because of the invalid statute, defendant Kempiners is further enjoined from denying it future applications because of its failure to apply for funding in prior years. Judgment to enter accordingly. The preceding shall serve as findings of fact and conclusions of law for purposes of Fed.R. Civ.P. 52(a).

---

**19.** In fact, in its statement of findings, the legislature indicated that there is a serious shortage of pregnancy-related services in Illinois, and that what services there are tend to be hard to get. *See* Ill.Rev.Stat. ch. 111½, § 4602–100 (1981). These findings were drafted before the statute was amended to exclude abortion counseling. These findings tend to indicate that the legislature assumed that many women serviced by the state program would receive no other counseling.

**20.** At least one other court has employed this analysis to strike down a similar statute. *See* *Planned Parenthood v. Arizona*, 537 F.Supp. 90 (D.Ariz.1982).

**21.** Since we have held that the statute is unconstitutional even when an application for funding requests state funds to be used for abortion counseling and referral, the injunction should not be limited to cases where the application contains no such request.